**Matthew STARK and Erma Sentz, Plaintiffs,**

v.

**ST. CLOUD STATE UNIVERSITY, Minnesota State University Board, Larry Putbrese, Field Experience Coordinator, St. Cloud State University, Defendants.**

**Civ. No. 4–83–681.**

United States District Court,
D. Minnesota,
Fourth Division.

March 29, 1985.

Barbara A. Leininger, Minnesota Civil Liberties Union, Minneapolis, Minn., for plaintiffs.

Michael K. Jordan, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendants.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiffs, Matthew Stark and Erma Sentz, brought this action for declaratory and permanent injunctive relief and attorney's fees alleging that defendants are funding and administering a program which advances religion in violation of the Establishment Clause of the First Amendment to the United States Constitution. Jurisdiction in the original complaint was alleged under 27 U.S.C. § 1343(3) and 42 U.S.C. § 1983. The case has previously been before the court on defendants' motion to dismiss or, in the alternative, for summary judgment. In an order dated December 31, 1983, the court dismissed the complaint against defendant Minnesota State Board of Teaching for failure to state a claim, but denied all other motions to dismiss on the basis that the plaintiffs should be allowed to amend their complaint to allege federal question jurisdiction. An amended complaint was filed and jurisdiction is alleged under federal question jurisdiction, 28 U.S.C. § 1331, and the First Amendment to the United States Constitution. This matter is now before the court on cross-motions for summary judgment brought by all parties.[1]

*Background*

The facts are basically undisputed. This action arises out of a student teaching program administered by defendant St. Cloud State University (the University). Larry Putbrese, Field Experience Coordinator at the University, is the administrator of the program. The program allows students to satisfy their student teaching requirement at private and private parochial schools.

Plaintiff Erma Sentz is a resident of Minnesota and an educator and employee of the University. She is presently on a three year leave of absence from the University. She expects to return to her position as of January 1, 1986. Sentz is an instructor and professor in the Department of Teacher Development (Department) and has been a Student Teaching Supervisor responsible for the coordination of student teaching

---

1. The plaintiffs agreed at the hearing to dismiss their claim for attorney's fees and costs pursuant to 42 U.S.C. § 1988.

centers. Sentz is also President of the Central Minnesota Teacher Education Council (CMIEC). CMIEC is a non-profit corporation established by the University for the purpose of promoting the improvement of teacher education with emphasis on student teaching. CMIEC functions as an advisory board for the student teaching program at the University. Affidavit of Erma Sentz.

The other plaintiff Matthew Stark is an individual taxpayer residing in the State of Minnesota who alleges that he has been directly affected by the student teacher policy administered by the University.[2]

Except for Larry Putbrese, defendants are all state agencies. Defendant Minnesota State University Board supervises the state universities. *See Minn.Stat.* §§ 136.-03, 136.12, and 136.14. The University is a state agency under the board. *Minn.Stat.,* § 16.011. Funds for operation of the University program are provided in part from the State of Minnesota's general operating fund pursuant to Article 11, § 1 of the Minnesota Constitution and *Minn.Stat.* §§ 16A.095–.11 and 16A.57.

*The University's Student Teaching Program*

The University's teacher preparation program has been established and approved in accordance with the rules of the Minnesota Board of Teaching. In the student teaching phase of the program, students are assigned for a full quarter to work in the classroom. The student teacher begins the quarter observing and gradually takes over teaching responsibilities until they are actually teaching the class. The placement is coordinated by a university supervisor in connection with the local school district and the cooperating teacher whose class the student teacher is to take over. The supervisor arranges the placement and visits the classroom on approximately a weekly basis to observe and evaluate the student teacher. The cooperating teacher works with the student teacher on a daily basis first demonstrating and explaining his or her own teaching methods. As the quarter progresses, the cooperating teacher gives feedback on the student teaching performance and, in some instances, assistance with lesson plans. Deposition of Kenneth Kelsey 38–39; Deposition of Jack Jones 23–24. The student teacher is also expected to become familiar with the normal routine of the school and in general do the things that teachers are required to do. Deposition of Kenneth Kelsey 39.

At present, the University is utilizing the school districts with which it has student teaching agreements on a rotating basis rather than using all of the districts each quarter. Deposition of Larry Putbrese 18. The University pays a participating district $6.00 per quarter hour for each student placed in the school district. Deposition of Kenneth Kelsey Exhibit 1. Payment is made by a requisition form completed by the Department. The University then issues a check to the school district. Once a check is issued, no limitation is placed on how the recipient school district uses the funds. Deposition of Robert Becker 14–17; Deposition of Kenneth Kelsey 42–44; Deposition of Kenneth Kelsey Exhibits 7–8. The funds for this program are received by the College of Education through the University budget appropriations from the state legislature. Deposition of Kenneth Kelsey 40–41; Deposition of Robert Becker 14; Defendants' Interrogatory Response

---

2. The court's order of December 30, 1983 found that defendants' challenge to plaintiffs' standing to sue was premature and allowed plaintiffs to amend their complaint and conduct discovery on the issue. The defendants have not raised the issue of standing in their present motion. The court finds that Sentz has a factual basis for alleging both a past and ongoing injury and that Stark has standing to sue as an injured taxpay-

er. *See, e.g., Valley Forge Christian College v. Americans United For Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Glastone Realtors v. City of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Exhibits 21–24. Since the fall of 1980, the University has placed two students at parochial schools for their student teaching experience. These schools have received $96 per student per quarter in public funds from the University for the participation in the program. These are tax funds appropriated by the state legislature. Deposition of Robert Becker 14–17; Deposition of Kenneth Kelsey 42–44.

*Involvement of Parochial Schools*

In the late 1970's the University received several inquiries from St. Cloud Cathedral High School (Cathedral), a private parochial school about the possibility of it becoming a student teaching site. Deposition of Kenneth Kelsey Exhibits 3–5. Cathedral's request was initially denied because the Department had decided not to establish any new student teaching sites in light of the continued decline in enrollment in the program. *Id.* Exhibit 3. Subsequently, the Department researched issues raised by using private schools, including any potential legal problems. Deposition of Robert Becker 8.

Eventually, in spite of opposition from the director of the student teaching program and others, arrangements were made for a student teaching placement in English to be made at Cathedral in the spring of 1980. *See* Deposition of James Jones 15, 32; Affidavit of Erma Sentz. A student teaching agreement with Cathedral was executed in April of 1980 on the University's standard form agreement. Deposition of Kenneth Kelsey Exhibit 1. Following the execution of this agreement the University adopted a formal policy entitled the "St. Cloud State University Policy regarding the Establishment of Student Teaching Sites at Private and Private Parochial Schools" (the policy). *Id.* Exhibit 6. It is this policy that the plaintiffs challenge as unconstitutional under the Establishment Clause of the First Amendment to the United States Constitution.

The policy provides that any private and parochial schools selected by the University's College of Education must meet all of the state and university criteria to the same extent and in the same manner as the public schools.[3] Once a site is selected and the agreement with the University is signed, students may, at their option, be placed in a nonpublic school for their student teaching assignment. The policy provides that students who choose to be placed in a nonpublic school shall be made aware that any involvement on their part in any religious aspect of a nonpublic school's program "is exclusively between the parochial school's personnel and the student teacher." *Id.* at ¶ 4b. The policy also provides that accommodations will be made for any University student teaching supervisors who, based upon religious grounds, object to supervising a placement at a nonpublic school. *Id.* at ¶ 8. Beyond these specific references to any religious aspects of a nonpublic school's program, the policy generally requires that the placement follow the procedures utilized in a public school placement.

The policy was developed after research by, and discussion among, members of the Department's faculty and staff from the office of the Minnesota Attorney General. Deposition of J. Jones 10–12, 16. In addition, a special form "Student Teaching Agreement" was drafted by the Attorney General's Office to insure that certain requirements imposed on public schools as a matter of state law were included in the agreements with nonpublic schools. Cathedral subsequently entered into such an agreement on January 26, 1982. Deposition of Kenneth Kelsey Exhibit 2.

The University has to date utilized two parochial schools as student teaching sites: Cathedral and St. Peter and Paul Primary School (St. Peter and Paul). A total of three students have been placed, two at

---

**3.** For example, the local district must agree that the cooperating teachers will be certified at standards equal or superior to the regulations of the State of Minnesota during the student teaching assignments. Deposition of Kenneth Kelsey Exhibit 1.

Cathedral and the most recent, a kindergarten placement, at St. Peter and Paul in the spring of 1983.[4] St. Peter and Paul did not formally execute a student teaching agreement with the University, but its administrator was contacted by telephone and indicated she was aware of the guidelines for placing students in a parochial school. Deposition of Larry Putbrese 30.

These placements were carried out according to the standard operating procedures. The students were placed for a full quarter, the typical observation and evaluation took place, and the schools were paid for the placements at the standard rate.[5] The funds paid to Cathedral were deposited into its food service account. Deposition of P. Wenner 33. At the present time, there are no agreements between the University and parochial schools for use as student teaching sites. According to Larry Putbrese, current Director of Field Experiences, this is primarily due to the institution of this litigation. Deposition of Larry Putbrese 33.

*Cathedral and St. Peter and Paul*

Both Cathedral and St. Peter and Paul are part of the Catholic Diocese of St. Cloud. Cathedral serves students from over twenty-seven local parishes. Deposition of Kenneth Kelsey Exhibit 11. The faculties include both lay and religious teachers. *Id.* The philosophy of Cathedral has been described in pamphlets prepared by the Cathedral High School Education Foundation and the school itself. *Id.* The brochures indicate the Christian emphasis of the school and the importance of religious values in its mission. "First and Foremost at Cathedral is the mission of teaching, living, and sharing the Christian faith." *Id.* "The Catholic faith was the inspiration that founded Cathedral.... That same selfless spirit of dedication to

God and neighbor permeates the entire community of Cathedral ... today." *Id.* "At the heart of Cathedral is the Church." *Id.* "On the basketball court, in the chemistry lab, around the lunch table, during a hard test, at Mass, in the morning when you greet friends in the hall, and at night when you wave good-bye from your bus, God is the center of all we do." *Id.*

*Discussion*

In passing upon a motion for summary judgment, the court is required to view the facts in the light most favorable to the nonmoving party, and the movant has the burden of establishing that no genuine issue of material fact remains and that the case may be decided as a matter of law. *Buller v. Buechler,* 706 F.2d 844 (8th Cir. 1983); *Ralph's Distributing Co. v. AMF, Inc.,* 667 F.2d 670 (8th Cir.1981). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076 (8th Cir.1980). However, the nonmoving party may not merely rest upon allegations or denials of the party's pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir.1981).

Plaintiffs claim that the facts establish that the placement policy has the impermissible effect of advancing religion and fosters an excessive government entanglement with religion. Defendants assert that no such forbidden attributes are attached to this policy and program because the parochial schools are providing a secular service for the state, that being the training of student teachers, rather than receiving any benefit.

In seeking to define the proper application of the Establishment Clause to the

---

4. The student placed at St. Peter and Paul had gone to a parochial school for some period of time and was very much aware of the differences between a parochial and a public school. Deposition of Larry Putbrese 28.

5. Under the standard $6 per quarter hour rate Cathedral received $96 for each student placed.

facts of this case the court is guided by well-established principles and Supreme Court precedents that appear directly on point. The court's role in such instances is not to construct new paths, but merely to ensure that the principles established are faithfully followed in this case. *Roemer v. Board of Public Works*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). Nevertheless, the defendants contend that the earlier cases and their rationales are suspect in light of the Court's recent decisions.

The general test governing this area is not controverted by the parties:

> Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Since *Lemon*, the parameters of this test have been explored and shaped. The Court has detailed the restraints imposed by the Establishment Clause on state aid for nonpublic school teachers and the utilization of state subsidized teachers in nonpublic schools. *See generally Felton v. Secretary, United States Dep't of Educ.*, 739 F.2d 48, 55 (2d Cir.), *cert. granted*, —— U.S. ——, 105 S.Ct. 241, 83 L.Ed.2d 180 (1984). In *Lemon* itself, the Court found excessive entanglement in a Rhode Island statute providing for up to a 15% salary supplement to teachers in nonpublic schools in which the average per pupil expenditure on secular education was below the average in public schools, conditioned on the teachers' giving only courses offered in the public schools and agreeing not to teach courses in religion. Writing for the court, Chief Justice Burger found the arrangement created excessive entanglement:

> A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These propylactic contacts will involve excessive and enduring entanglement between state and church.

*Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114.[6]

The Court's subsequent decision in *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) appears to be most analogous to the facts of this case. In part V of *Meek* the plurality held unconstitutional a Pennsylvania statute, Act 194, which authorized the Secretary of Education to provide "auxiliary services" such as counseling and remedial teaching to all children enrolled in nonpublic schools grades K–12 meeting Pennsylvania's compulsory attendance requirements.[7] The teachers involved in the program were part of the public school system and similar services were provided to public school children. The plurality refused to recognize any distinction from *Lemon* based on the fact that "the teachers and counselors providing auxiliary services are employees of the public intermediate unit, rather than of the church-related schools in which they work." 421 U.S. at 371, 95 S.Ct. at 1766. This "does not substantially eliminate the need

---

**6.** This result was reached under the facts presented in *Earley v. Dicenso*, 403 U.S. 602, 91 S.Ct. at 2105, 29 L.Ed.2d 745 (1971), the companion case to *Lemon*.

**7.** The plurality opinion was written by Justice Stewart for himself, Justice Blackmun and Justice Powell, and concurred in by Justice Brennan for himself, Justice Douglas and Marshall. Dissenting opinions were written by Chief Justice Burger and Justice Rehnquist, the latter being joined by Justice White.

for continuing surveillance." *Id.* While the auxillary services personnel were not "directly subject to the discipline of a religious authority," they were "performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." *Id.*

In those cases where the court has distinguished or perhaps limited *Lemon* or *Meek,* it has reaffirmed its essential holding that the funding of academic or therapeutic services for parochial students, when it is provided at the parochial school, violates the Establishment Clause even if provided by public school personnel.[8] In *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), an Establishment Clause challenge was made to the provisions of an Ohio statute authorizing the expenditure of state funds for diagnostic services to be provided to nonpublic schools on the nonpublic school premises, and for therapeutic services to be provided off the school premises. The *Wolman* plaintiffs argued first that the diagnostic services violated the three-prong test because they were provided on the premises of the nonpublic school. The Court upheld this portion of the statute, distinguishing *Meek* on the basis that the role of the diagnostician "does not provide the same opportunity for the transmission of sectarian views as attends the relationship between teacher and student or that between counselor and student." 433 U.S. at 244, 97 S.Ct. at 2603.

In contrast, in the action before the court, the student-teacher is responsible for the full classroom experience during a high percentage of one school quarter in a manner substantially identical to a fully-certified teacher. The relationship even goes beyond that of a public school teacher in a nonpublic school, because the student-teacher is directly under the supervision and guidance of a parochial school teacher, and thus is in the impressionable position of being a student as well as a teacher.

The *Wolman* Court also upheld the funding of off-premises therapeutic services, holding that "the services are to be offered under circumstances that reflect their religious neutrality." *Id.* at 247, 97 S.Ct. at 2605. Justice Blackmun writing for the Court emphasized that this factual setting distinguished the case from *Meek* where

---

**8.** The Court has limited this line of reasoning to elementary and secondary schools, finding challenged private institutions of higher learning to be categorically different. In *Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), the Court upheld a state grant program to private colleges that was based on the number of full time students and which provided that no monies could be utilized for sectarian purposes. Justice Blackmun writing for the plurality thought that the primary-effect test was met by the district court's finding that the four colleges at issue were not pervasively sectarian. This conclusion was based on the lower court's subsidiary findings on the role of religion in particular aspects of the colleges which he found were not clearly erroneous. *Id.* at 758, 96 S.Ct. at 2350. Justice Blackmun also found on several grounds that the funding relationship was not excessively entangling. Most relevant to the case at hand are the distinctions the plurality noted between the schools in *Lemon* and the colleges in *Roemer,* which they found to be "most impressive":

> The elementary and secondary schooling in *Lemon I* came at an impressionable age; the

aided schools were "under the general supervision" of the Roman Catholic diocese; each school had a local Catholic parish that assumed "ultimate financial responsibility" for it; the principals of the schools were usually appointed by church authorities; religion "pervade[d] the school system"; teachers were specifically instructed by the "Handbook of School Regulations" that " '[r]eligious formation is not confined to formal courses; nor is it restricted to a single subject area.' " 403 U.S. 617–618 [91 S.Ct. at 2113–2114]. These things made impossible what is crucial to a nonentangling aid program; the ability of the State to identify and subsidize separate secular functions carried out at the school, without on-the-site inspections being necessary to prevent diversion of the funds to sectarian purposes.

*Id.* at 764–65, 96 S.Ct. at 2353–54.

Cathedral and St. Peter and Paul, the parochial schools utilized thus far under the policy challenged here, fit precisely the "pervasively sectarian" description in *Lemon.*

the danger that public personnel might transmit religious instruction and beliefs

> arose from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school.... The danger existed there, not because the public employee was likely deliberately to subvert his task to the service of religion, but rather because the pressures of the environment might alter his behavior from its normal course.

*Id.* Where therapeutic services are offered at truly religiously neutral locations, "the danger perceived in *Meek* does not arise", since "the influence of a therapist's behavior that is exerted by the fact that he serves a sectarian pupil is qualitatively different from the influence of the pervasive atmosphere of a religious institution." *Id.* The Court added that under these circumstances there would be no excessive entanglement since "[i]t can hardly be said that the supervision of public employees performing public functions *on public property* creates an excessive entanglement between church and state." *Id.* at 248, 97 S.Ct. at 2605 (emphasis supplied). On this portion of the decision five Justices upheld the government funding of therapeutic services for parochial school students only if these were provided in public facilities. Two Justices would have found even that to violate the Establishment Clause. *Felton,* 739 F.2d at 63–64 & n. 14. In direct contrast to the therapeutic services in *Wolman,* the teaching and evaluation process at issue here is conducted at the parochial schools themselves.

In *Felton,* the Second Circuit felt compelled to conclude that, based on this line of precedent, public funds can be used to afford instruction or therapeutic services in parochial schools only if they are afforded at a neutral site off the premises of the religious school. *Id.* at 64. The Establishment Clause challenge in *Felton* was to the use of federal funds under Title I of the Elementary and Secondary Education Act

of 1965, 20 U.S.C. § 2701 *et seq.,* to finance a New York City program wherein public school teachers and other professionals were sent into nonpublic schools to provide remedial instruction and clinical and guidance services to students meeting the federal standards. The court rejected the challenge that the actual working of the New York City program saved it from any funding of unconstitutionality. It emphasized that *Meek* did not rest on a conclusion that the challenged act had actually fostered religion but "rather on a conclusion that, in order to be sure it would not, Pennsylvania would be required to monitor its operation so closely as to violate the entanglement test". *Id.* at 65. Accordingly, the *Felton* court struck down the challenged program on the excessive entanglement test, and noted that constitutional infirmities existed on the primary effect test, also. *Id.* at 65–72.

In *Americans United for Separation of Church and State v. School District of the City of Grand Rapids,* 718 F.2d 1389 (6th Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984), the Sixth Circuit found the Establishment Clause to be violated by a "Shared Time and Community Education" program funded and operated by the public school district in school buildings owned and operated by various religious denominations. Under the Shared Time program, the public school district offered substantive courses from its general curriculum to nonpublic students during regular school hours. The courses were offered at the nonpublic schools in classroom space leased by the public school district. The court found the Supreme Court precedents noted above to be determinative, and accordingly, affirmed the district court's judgment that the challenged programs created an excessive entanglement between government and religion. *Id.* at 1404–05. The court found fault with many aspects of the program, but emphasized that direct aid to the parochial schools coupled with the on-site instruction to students was impermissible. *Id.* at 1405–07.

■ The undisputed facts in this action, interpreted in light of the above case-law, establish that the University policy violates the Establishment Clause. The challenged policy allows the placement of public university student-teachers at a parochial school in any one of the substantive academic areas for which teachers are certified. The Department's hands-on role in the program is the weekly on-site supervision of the placement by a faculty member including discussions with both the student-teacher and the parochial teacher. The sum of the various aspects of the program is that a much greater entanglement with a pervasively sectarian setting occurs than is permissible under the Court's decisions in this area.[9]

In fact, the on-site teaching of the full range of academic subjects creates an even greater danger of fostering religion than the programs involved in *Meek, Wolman, Americans United for Separation of Church and State,* and *Felton.* The policy does not establish any procedures to ensure that the public university students and the university supervisors maintain the necessary strict religious neutrality. Rather, "[a]ny involvement by the student teacher in any religious aspect of a private parochial school's program is exclusively between the parochial school personnel and the student teacher." The only limitation imposed is that the student must teach a subject area for which certification is sought, eliminating the risk that a religion course would be taught. Thus, the danger that the student-teacher might intentionally or unintentionally engage in the impermissible inculcation of religion is real and not insubstantial. To ensure this did not occur would require "comprehensive, discriminating and continuing state surveillance". *Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114. This surveillance by itself is a constitutionally excessive entanglement of church and state.

An examination of the policy's operation to date gives some indication of the difficulties faced by the University and other defendants in proving that the policy does not foster religion and that the surveillance necessary to ensure such an outcome is not excessively entangling. The defendants face a heavy burden to dispel the possibility of intentional or inadvertent fostering of religion. The policy and special agreement form for parochial schools were not adopted until after the first placement at Cathedral, and it is unclear whether Cathedral even received a copy of the policy prior to this litigation. The subsequent placement at St. Peter and Paul was done over the telephone and the school never did formally execute a student teaching agreement, nor did it receive a copy of the policy. It can hardly be said that the necessary safeguards both exist and are not excessively entangling when the participating schools may not even have a copy of the policy, and, no prohibition exists against the public university student-teachers involving themselves in the religious activities of the school.

Furthermore, the participants in the program are by definition all supportive of the placement in a parochial school and therefore no incentive exists for complaint. *Felton,* 739 F.2d at 65. The nonpublic school, its cooperating teacher, and its students are all accustomed to coloring the educational experience with religious content and perspective. They are unlikely to notice or complain if the student teacher is included in or initiates that type of experience. The student teacher will have agreed to the placement in a parochial school and, therefore, often will be supportive of its religious milieu. The lack of incentive to complain is even greater than in those cases involving fully licensed teachers because the university student is at an impressionable stage of teacher preparation and subject to the influences of the parochial in-

---

9. The parochial schools used under the program contain the same ingredients that were recognized in *Lemon* as providing a pervasively sec-

tarian setting. *Lemon,* 403 U.S. 617–18, 91 S.Ct. at 2113–14; *see supra* note 8.

structor who is, in effect, the tutor. The university supervisor must also be a willing participant in the parochial placement and the oversight provided is limited. "Because '[t]he State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion', reliance could not be placed simply 'on the good faith and professionalism of the secular teachers and counselors functioning in church-related schools.'" *Felton*, 739 F.2d at 65–66 (quoting *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114; and *Meek*, 421 U.S. at 369, 95 S.Ct. at 1765).

Accordingly, there must be active and extensive surveillance, which has not been provided, to prevent the fostering of religion. Yet, under *Meek* this very surveillance constitutes excessive entanglement. *Meek*, 421 U.S. at 372, 95 S.Ct. at 1766; *Felton*, 739 F.2d at 64 & n. 16.

The policy also fails to provide any express restrictions on the use of the state funds that are provided to a parochial school for the placement of a student teacher in its classrooms. Even though it appears that the monies actually paid to date have been used for secular purposes, there is no prohibition against their being

used wholly or primarily to advance religion. In addition, the surveillance necessary to ensure this did not occur simply increases the already constitutionally excessive entanglement. *Id.*

■ The defendants argue that the reasoning of *Meek* and *Felton* is factually distinguishable because in those cases the State was helping the nonpublic school advance its secular functions. The constitutional infirmities arose because it could not be determined without excessive entanglement whether such aid was also promoting sectarian functions. The defendants claim that in this case the nonpublic institutions are providing a wholly secular service to the University for which it can receive payment; any other benefit it might be receiving is incidental and permissible.[10]

A careful review of the record establishes that the defendants' position is incorrect, however. The policy does help the nonpublic school advance its secular functions. To begin with, all actions taken must be viewed in light of the undisputed fact that the placement of student-teachers in nonpublic schools was initiated at the request of the parochial schools. Indeed, the University has an overabundance of available

---

**10.** The defendants are correct in stating that the Supreme Court has dispelled "any notion that a religious person can never be in the state's pay for a secular purpose." *Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 746 & n. 13, 96 S.Ct. 2337, 2345 & n. 13, 49 L.Ed.2d 179. Yet, such arrangements are permissible only where a valid secular purpose exists and the danger of aiding sectarian values is circumscribed. Neutrality is what is required. *Id.* at 747, 96 S.Ct. at 2345. In the case cited by the Court in *Roemer* as upholding payment for a secular service, there was no question that the payment was for a wholly secular task. *Bradfield v. Roberts*, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899) (public aid to corporation which, although composed entirely of members of a religious order, was limited by its corporate charter to the secular purpose of operating a charitable hospital). The parochial schools involved here, far from being limited to secular purposes like the hospital in *Bradfield*, are pervasively sectarian settings, however. Thus, even accepting defendants argument that the parochial schools are providing a service rather than accepting benefits, the arrangement is impermissible. Fur-

thermore, the State's involvement goes beyond monetary payment and includes the presence of public university student-teachers and faculty members in the parochial schools. Their participation in the educational process makes it impossible to ensure that there is no appreciable risk of the program being used to advance religion. *See, e.g., Meek v. Pittinger*, 421 U.S. 349, 369–73, 95 S.Ct. 1753, 1765–67, 44 L.Ed.2d 217 (1975); *Lemon v. Kurtzman*, 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971).

Defendants argue that the Supreme Court's recent decisions on the Establishment Clause require looking at the area with new eyes. *See Lynch v. Donnelly*, — U.S. —, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). Those cases arise in contexts other than State involvement with teachers in nonpublic schools, however. The precedents in that area such as *Lemon v. Kurtzman* and *Meek v. Pittinger* remain, and this court is bound by them. *Hutto v. Davis*, 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982) (per curiam).

public school districts for student teacher placement and has no need to use parochial schools. Under these circumstances, no secular purpose is advanced by using a parochial school when there are public school alternatives. In fact, public schools that wish to participate in the program are harmed because they lose the opportunity of a student-teacher placement with every placement in a nonpublic school.

On the other hand, a number of important benefits are provided to the parochial school that participates in the program. The parochial school receives public funds based on the student teacher's quarter hours and, has, for all practical purposes, no offsetting expenses arising from its participation in the program. While the cooperating parochial teacher must spend time supervising or assisting the student, by the later part of the quarter the student has taken over all or part of the class load. The interaction of the student and University supervisor with the parochial school provides access to the latest instruction methods and ideas on improving the educational experience. The placement also provides the school with an excellent opportunity to evaluate the student-teacher's qualifications and, if the reviews are favorable, to persuade the student to join the faculty upon graduation. Finally, the highly visible connection with a state university program for the certification of teachers may provide a significant symbolic and practical benefit to religion by raising an aura of state sponsorship and/or approval of the parochial school and its teaching staff. *See, e.g., Roemer v. Maryland Public Works Bd.,* 426 U.S. 736, 747–48, 96 S.Ct. 2337, 2345–46, 49 L.Ed.2d 179 (1976); *Felton,* 739 F.2d at 67–68.

The policy does not even facially limit itself to advancing a secular function of the parochial school, but allows the student-teacher's involvement with religion to be left up to the student and the parochial school. Likewise, the parochial school's use of the public funds provided is not in anyway regulated. Those facial inadequacies combined with the actual operation of the program establish that the defendants as a matter of law cannot show with sufficient clarity that this policy would serve the State's legitimate secular ends in using nonpublic schools, if any exist, without any appreciable risk of being used to advance religious views.[11] *Committee for Public Education v. Regan,* 444 U.S. 646, 662, 100 S.Ct. 840, 850, 63 L.Ed.2d 94 (1982); *Meek v. Pittinger,* 421 U.S. 349, 369–73, 95 S.Ct. 1753, 1765–67, 44 L.Ed.2d 217 (1975).

■ The Supreme Court has recently recognized the importance of examining historical tradition in analyzing First Amendment issues concerning separation of church and state. *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed. 1019 (1983). The Free Exercise and Establishment Clauses of the First Amendment have enabled our society to develop with all individuals having the right to practice the religion of their choice, and the state preferring none. A great many religions have flourished, but the state has remained independent of any. Under the Constitution care must be taken to preserve this balance, and for the reasons already discussed the student-teaching program at issue does not pass constitutional muster.

## DECLARATORY JUDGMENT AND ORDER

Accordingly, based upon the above and all the files, records, and proceedings herein,

---

**11.** This determination is further supported by evidence of divisiveness caused by adoption of the policy. The policy was opposed by the director of student teaching and some faculty members. *See* Deposition of James Jones 15, 32; Affidavit of Erma Sentz. The existence of political divisiveness is an evil addressed by the Establishment Clause, and the controversy here is further evidence of excessive institutional entanglement and that the policy is perceived as an endorsement of religion. *Lynch v. Donnelly,* —— U.S. ——, 104 S.Ct. 1355, 1367, 79 L.Ed.2d 604 (1984) (O'Connor, J. concurring); *Lemon,* 403 U.S. at 622–25, 91 S.Ct. at 2115–17.

1. The motion of plaintiffs Matthew Stark and Erma Sentz for summary judgment is granted, and the court hereby declares that the St. Cloud State University Policy Regarding the Establishment of Student Teaching Sites at Private and Private Parochial Schools is unconstitutional for the reasons set forth in the Memorandum Opinion accompanying this Order.

2. Defendants, their agents, employees, and persons acting under their direction and control, are hereby permanently enjoined from enforcing, applying, or implementing in any way, the St. Cloud State University Policy Regarding the Establishment of Student Teaching Sites at Private and Private Parochial Schools.

3. The motion of defendants for summary judgment is denied.

4. Plaintiffs' claim for attorney's fees pursuant to 42 U.S.C. § 1988 is dismissed.

LET JUDGMENT BE ENTERED ACCORDINGLY.