802 F.2d 1046
 55 USLW 2257, 35 Ed. Law Rep. 387
 Matthew STARK and Erma Sentz, Appellees,
v.
ST. CLOUD STATE UNIVERSITY, Minnesota State University
Board, Larry Putbrese, Field Experience
Coordinator, St. Cloud State University,
Appellants.
 No. 85-5135.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 9, 1985.
Decided Oct. 8, 1986.
 
 Cindy L. Lavorato, St. Paul, Minn., for appellants.
 Stanford Robins, Minneapolis, Minn., for appellees.
 Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge and BOWMAN, Circuit Judge.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 St. Cloud State University, a Minnesota public university, permits students seeking to become licensed teachers to fulfill student teaching requirements by instructing at parochial schools. The district court[1] granted a declaratory judgment, holding that the University's policy violates the Establishment Clause of the first amendment by primarily promoting religion and tending to excessively entangle the state with religion. These rulings are challenged on appeal. For the reasons discussed below, we affirm.
 
 
 2
 I. BACKGROUND.
 
 
 3
 St. Cloud State University requires students seeking an education degree to take a course in student teaching for one academic quarter (about eleven or twelve weeks). The teaching experience usually earns the student sixteen credits. Candidates for other University degrees must take the course to obtain a Minnesota teaching license.
 
 
 4
 In the student teaching course, the University places the student in an elementary or secondary school that has contracted to become a student teaching site. The University pays the participating school $6 per credit--$96 for each student teacher per quarter--but places no limits on the participating school's use of the money.
 
 
 5
 The student teacher begins the quarter by observing the techniques and methods of a licensed teacher employed by the participating school. As the quarter progresses, the student teacher assumes more and more responsibility, until eventually the student actually teaches the class under the full-time supervision of the cooperating teacher. Approximately once a week during the placement, a supervisor from the University observes the student teacher's classroom performance. The supervisor makes written evaluations, which are discussed with the student and the cooperating classroom teacher.
 
 
 6
 In the late 1970's, Cathedral High School of St. Cloud, a private parochial school, made several requests to serve as a student teaching site for the University. Although the University initially rejected Cathedral's advances, it placed a University student, with the student's consent, at Cathedral in the spring of 1980. The University and Cathedral entered into the standard contract designating Cathedral as a student teaching site.
 
 
 7
 Following the execution of the Cathedral contract, the University promulgated a formal policy entitled, "St. Cloud State University Policy Regarding the Establishment of Student Teaching Sites at Private and Private Parochial Schools." This policy provides that private and parochial schools can become student teacher sites if they meet the criteria required of public schools. A student can, at his or her option, be placed at a private or parochial school selected by the University to participate in its student teaching program. Final approval of the student's placement, however, rests with the University's field experience coordinator. Under the policy, the University must advise those students placed at parochial schools that the student's participation in any religious aspect of the school "is exclusively between the parochial school's personnel and the student teacher." Further, the University will "provide accommodation for any of its student teaching supervisors who, based upon religious grounds, object to conducting on-site visits to a private parochial school."[2]
 
 
 8
 Although sufficient public schools existed for student placements at all relevant times, the University placed three students at parochial schools prior to this lawsuit. Two students taught at Cathedral High School,[3] one in social studies and the other in English. Another student taught kindergarten at St. Peter and Paul's Primary School. Both parochial schools are members of the Catholic Diocese of St. Cloud and are funded, in part, by their parishes. The University conducted these student teaching courses in the usual manner, with the students receiving the typical observation and evaluation from a cooperating parochial school teacher and a University supervisor. The University paid the parochial schools the ordinary rate, and placed no limitations on the schools' use of this money.[4]
 
 
 9
 Erma Sentz, a University professor, and Matthew Stark, a Minnesota resident and a taxpayer, sought a declaratory judgment that the University's policy violates the Establishment Clause, and requested a permanent injunction against its further enforcement. They named as defendants the St. Cloud State University, the Minnesota State University Board, which supervises the state universities, and Larry Putbrese, who is the University's field experience coordinator. Both St. Cloud State University and the Minnesota State University Board are state agencies. See Minn.Stat. Sec. 16.011.
 
 
 10
 On cross-motions for summary judgment, the district court concluded that, on the undisputed facts, the University's policy had the primary effect of advancing religion and tended to excessively entangle the state with religion. The district court therefore granted the plaintiffs' motion for summary judgment, declaring that the policy violated the Establishment Clause of the first amendment, and permanently enjoining its further implementation. This appeal follows.
 
 
 11
 II. DISCUSSION.
 
 
 12
 When reviewing an appeal from a district court's grant of a motion for summary judgment, this court applies the same standards as the district court was to have applied. Kresse v. Home Insurance Co., 765 F.2d 753, 754 (8th Cir.1985). The facts in this case are essentially undisputed, and the district court properly determined that the case could be decided as a matter of law. Burford v. Tremayne, 747 F.2d 445, 447 (8th Cir.1984); see Fed.R.Civ.P. 56(c). Although the appellants contend that the district court failed to give them all favorable inferences that could be drawn from the facts, see Snell v. United States, 680 F.2d 545, 547 (8th Cir.), cert. denied, 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982), examination reveals that their dispute lies not with the facts as determined by the district court, but with the legal conclusion that the court held must follow from those facts. The issue before us, therefore, is whether the district court properly determined that the University's policy violated the Establishment Clause of the first amendment.
 
 
 13
 The first amendment of the Constitution begins with the stern enjoinder that "Congress shall make no law respecting the establishment of religion." The purpose of this emphatic mandate, applicable to the states through the fourteenth amendment, Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947), is "to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other." Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). It prohibits "sponsorship, financial support, and active involvement of the sovereign in religious activity," Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 772, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973) (quoting Walz v. Tax Comm'n, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)), and demands that the states steer "a course of neutrality among religions, and between religion and nonreligion," Grand Rapids School Dist. v. Ball, --- U.S. ----, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985). The Establishment Clause does not represent, however, a blanket prohibition of every government program that indirectly aids a religious institution. "It has never been thought either possible or desirable to enforce a regime of total separation" between the state and religion. Nyquist, 413 U.S. at 760, 93 S.Ct. at 2959.
 
 
 14
 Because the University constitutes a state agency, its placement policy will violate the Establishment Clause if the policy fails to satisfy the three-prong test developed by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). First, the policy must serve a secular purpose. Second, the primary effect of the policy cannot be to advance or inhibit religion. Third and last, the policy cannot foster an excessive entanglement of the state with religion. Id. at 612-13, 91 S.Ct. at 2111.
 
 
 15
 Although simple to state, the three-prong Lemon test presents difficult questions of interpretation and application. See Mueller v. Allen, 463 U.S. 388, 392, 103 S.Ct. 3062, 3065, 77 L.Ed.2d 721 (1983). The first prong, whether the policy has a secular purpose, poses the least problems. The University assertedly adopted its placement policy in an effort to provide for its students' education by increasing the number of available student teaching sites. This purported objective certainly constitutes a valid secular purpose, although the overabundance of existing sites casts some doubt on whether it actually motivated the policy's adoption. Cf. Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982) ("There can be little doubt that [the state's asserted objective] embraces valid secular legislative purposes. However, these valid secular objectives can be readily accomplished by other means * * *.") (footnote omitted). We are "reluctan[t] to attribute unconstitutional motives" to a governmental body, however, Mueller v. Allen, 463 U.S. at 394, 103 S.Ct. at 3067, and therefore will accept the University's avowed purpose for this appeal.
 
 
 16
 But a secular purpose cannot save the University's policy if its primary effect is to advance religion. Of necessity, the University students in this case teach secular courses at the parochial schools.[5] We therefore begin our inquiry into the primary effect of the University policy by examining whether the institutions receiving state aid are pervasively sectarian. Grand Rapids School Dist. v. Ball, 105 S.Ct. at 3223. "Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission * * *." Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973).
 
 
 17
 Both Cathedral High School and St. Peter and Paul's Primary School are members of the Catholic Diocese and receive partial funding from their parishes. Students attending Cathedral must take religion courses during each year of their attendance.[6] Moreover, according to Cathedral literature,[7] religion is not confined to religious classes and activities. To quote a brochure provided prospective students, "On the basketball court, in the chemistry lab, around the lunch table, during a hard test, at Mass, in the morning when you greet friends in the hall, and at night when you wave good-bye from your bus, God is the center of all we do." Teachers play an essential role in providing this integrated secular and religious education, instructing "in Christian values in a formal way through classroom instruction, but also by example."
 
 
 18
 We must conclude, as did the district court, that both Cathedral and St. Peter and Paul's are pervasively sectarian institutions. The placement of state University students in these institutions, therefore, can benefit religion even though the students teach secular courses. The secular education that these institutions provide "goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution[s], the two are inextricably intertwined." Lemon v. Kurtzman, 403 U.S. at 657, 91 S.Ct. at 2133 (Brennan, J., concurring); see also Grand Rapids School Dist. v. Ball, 105 S.Ct. at 3223; Meek v. Pittenger, 421 U.S. 349, 366, 95 S.Ct. 1753, 1763, 44 L.Ed.2d 217 (1975); Walz v. Tax Comm'n, 397 U.S. at 671, 90 S.Ct. at 1412.
 
 
 19
 Given that the parochial schools serving as student teaching sites are pervasively sectarian, we are forced to conclude that the University's policy impermissibly advances religion by creating a perception that the state endorses the institutions' religious mission. Grand Rapids School Dist. v. Ball, 105 S.Ct. at 3226-27. The first amendment rests on the belief that "a union of government and religion tends to destroy government and to degrade religion." Engel v. Vitale, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962). When a state program fosters the appearance of such a union, the state places its imprimatur on the religion and thereby "promotes religion as effectively * * * as when it attempts to inculcate specific religious doctrines." Grand Rapids School Dist. v. Ball, 105 S.Ct. at 3226.
 
 
 20
 In this case, the parochial schools receive both benefits and burdens from the student teacher placements. They get an opportunity to evaluate the student teachers for future employment.[8] They receive state funds with no strings attached. The University publicly recognizes them as suitable forums for teaching University students the practical skills necessary for state certification. In addition to these benefits, however, the parochial schools shoulder the great responsibility of supervising the student teacher and essentially turning a novice into a professional. By designating the parochial schools as both recipients of state benefits and repositories of state trust, the University's program cannot help but communicate a message of government endorsement of the parochial schools and their religious messages.
 
 
 21
 Additionally, the University's program creates the perception of a symbolic union between church and state in the minds of the parochial schools' students. Adults often can separate the power of the state from the prophecy of the church in instances where impressionable children cannot. "The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of the environment as much as of free and voluntary choice." Grand Rapids School Dist. v. Ball, 105 S.Ct. at 3226. By creating the perception in the minds of the parochial school students that the state supports the religious school and its message, the state thereby promotes the religious mission of the institution.
 
 
 22
 Here, the parochial school students witness the state join with the church to teach them in an atmosphere dominated by religion. The pupils watch the state-sponsored student teacher instruct their class under the full-time supervision of their regular parochial school teacher. The state and parochial school teachers do not merely "pace the same halls," as they did in Grand Rapids School Dist. v. Ball, 105 S.Ct. at 3227, but they jointly teach the same class. The pupils of the parochial school therefore see a true union between church and state.[9] In addition, a supervisor from the state University observes the student's classroom performance approximately once a week, adding one more state actor whose presence the pupils of the parochial school can note and digest. The University's policy of placing student teachers in the parochial schools thus creates the unmistakeable impression that the University approves of the religious mission on which the institutions are embarked.
 
 
 23
 The appellants contend, however, that the University's policy cannot be seen as creating a symbolic union between the church and state because a University student requests individual placement in a parochial school. The appellants argue that the University's policy represents a neutral program under which any qualified school--public, private, or parochial--can serve as a student teaching site. Thus, appellants contend that any aid to religion stems from the private choices of the student teachers, and not from the University policy. Therefore, they argue, no state aid to religion results from the University's policy.
 
 
 24
 We disagree. First, the placement of the students in the parochial schools cannot be seen as a purely private choice of the student. The University initially selects the parochial school as a suitable student teaching site, and exercises the power of final approval over every student placement. Second, the means by which state aid flows to the institution comprises "only one among many factors to be considered." Nyquist, 413 U.S. at 781, 93 S.Ct. at 2970. Although "it is clear * * * that direct aid in whatever form is invalid," id. at 780, 93 S.Ct. at 2969, indirect aid can be equally impermissible if it confers an imprimatur of state approval on the religious institution. See Witters v. Washington Department of Services for the Blind, --- U.S. ----, 106 S.Ct. 748, 751 n. 3 & 753, 88 L.Ed.2d 846 (1986) (state court not barred from inquiring, on remand, whether indirect aid to religion creates an impermissible symbolic union between church and state).
 
 
 25
 The interjection of the student's decision to teach at a parochial school does not neutralize the symbolic link between the state and the church in this instance. Indeed, a much stronger link results from the University's policy than that which the Supreme Court held impermissible in Grand Rapids School Dist. v. Ball, --- U.S. ----, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). In Ball, the state-sponsored teachers and those employed by the parochial school did not teach the same students at the same time, as do the teachers here. Moreover, the state program in Ball at least made some attempt to divorce the state from the religious message of the institutions where its teachers taught. See id. at 3220 (state cleared its classrooms of religious symbols and marked them as a "public school classroom"). In contrast, the University here makes no effort even to limit its student teachers from participating in religious events of the schools and thereby furthering the identification of church and state. Rather, the student's participation "is exclusively between the parochial school's personnel and the student teacher." A significant danger exists that the University students will, intentionally or inadvertently, inject religious tenets into their teaching. Cf. id., 105 S.Ct. at 3224-26 (state policy directly advances religion by creating a situation in which state teachers could inculcate religion).[10] The pupils of the parochial school could only conclude in such instances that the state has not only endorsed the religious views of its school, but has affirmatively undertaken the instruction of such views.
 
 
 26
 As the Supreme Court has often observed, the lines of demarcation between permissible and impermissible state aid are difficult to perceive in this sensitive and controversial area of constitutional law. See Lemon v. Kurtzman, 403 U.S. at 612, 91 S.Ct. at 2111. The lines appear somewhat more clearly, however, when the state attempts to sponsor teachers and similar personnel at pervasively sectarian elementary and secondary schools. The Supreme Court has consistently held, on various grounds, that such attempts violate the Establishment Clause. See, e.g., Aguilar v. Felton, --- U.S. ----, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); Grand Rapids School Dist. v. Ball, --- U.S. ----, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985); Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Compare Wolman v. Walter, 433 U.S. 229, 244, 97 S.Ct. 2593, 2603, 53 L.Ed.2d 714 (state-supplied diagnostian unlike teacher because diagnostian is not likely to transmit sectarian views with a teacher's authority).
 
 
 27
 On the undisputed facts, the University's policy confers the state's blessing and its funding on the pervasively sectarian institutions at which the University students teach. We must agree with the district court that this policy communicates the state's approval of the schools' religious message. Stark v. St. Cloud State University, 604 F.Supp. at 1565. Because such state endorsement has the primary effect of advancing religion, the policy violates the Establishment Clause. See Grand Rapids School Dist. v. Ball, 105 S.Ct. at 3226; Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). We therefore affirm the district court without addressing the other grounds on which the district court held that the policy violated the first amendment.[11]
 
 
 28
 III. CONCLUSION.
 
 
 29
 For all the foregoing reasons, we affirm the declaratory judgment and injunction entered by the district court.
 
 
 30
 BOWMAN, Circuit Judge, dissenting.
 
 
 31
 I respectfully dissent. In my view, the student teacher training program at issue in this case neither has the primary effect of advancing religion nor does it tend excessively to entangle the state with religion. See Witters v. Washington Department of Services for the Blind, --- U.S. ----, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (aid to student under state vocational rehabilitation program to finance student's training at a private Christian college where he was seeking to become a pastor, missionary, or youth director held not to advance religion in a manner inconsistent with the Establishment Clause); Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (upholding, inter alia, state tax deductions for expenses incurred by taxpayers in providing for the education of their children in parochial schools; that state officials must determine whether particular textbooks qualify for the tax deduction and must disallow deductions for books and materials used in teaching religious doctrines is an insufficient basis for finding excessive entanglement). Without belaboring the point, I believe that decisions such as Witters and Mueller make it plain that the Establishment Clause is not offended by a program that allows students from a state university to do their practice teaching in private schools, including those with religious affiliations, as well as in public schools.
 
 
 32
 This is a case of first impression. In striking down St. Cloud State University's student teacher training program, our Court expands the boundaries of the Establishment Clause far beyond those that the decisions of the Supreme Court have drawn. We are dealing here not with a program for directing state aid to parochial schools, but with a program whose sole purpose is to provide students with practice-teaching opportunities in a variety of settings. As the Court concedes, ante at 1049, the aim of the program is secular. Since the practice teacher merely supplants (and requires the constant supervision of) the regular teacher, the program results in no augmentation of the teaching mission of the host school. If anything, the student teacher, by reducing the experienced regular teacher's time with the class, actually detracts from the teaching mission of the host school. For its pains in providing the student teacher with a class to teach and a full-time mentor (the regular teacher), the host school, public or private, receives a payment of $96 per quarter, which it can spend in any way it chooses. The transaction involves not a subsidy to the host school, but a token payment to it for services rendered. Moreover, there is nothing in the challenged program to suggest state endorsement of any particular religious practice or belief, or even to suggest a preference for religion over the absence of religion. The program is entirely neutral on the subject of religion. It merely makes student practice teachers available to all schools that meet the prescribed academic criteria, not just public schools. To see in this arrangement a violation of the Establishment Clause is, in my judgment, to be concerned with shadow rather than with substance.
 
 
 33
 In short, I believe that both the District Court and our Court have applied the Establishment Clause not only in an unprecedented way, but also in a way that is both insensitive and mechanistic. The result is a radical application of federal power to strike down a state program that is (a) useful to the University and its student practice teachers, and (b) a threat to the civil liberties of no one. I would reverse the decision of the District Court.
 
 
 
 [1]
 The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota. The district court opinion is reported at 604 F.Supp. 1555 (D.Minn.1985)
 
 
 [2]
 The University also adopted a new contract to be used only with private or private parochial schools selected as student teaching sites. The contract refers to religion only once, stating that the University agrees that it "will not attempt to regulate any religious aspect of the [parochial] school."
 
 
 [3]
 Cathedral also serves as a student teaching site for two private colleges, St. John's University and the College of St. Benedict
 
 
 [4]
 Cathedral placed its money in its food service account. The record reveals no information pertaining to the use to which St. Peter and Paul's Primary School put its money
 
 
 [5]
 Under Minnesota licensure rules, the student must teach in the subject area for which certification is sought. Minnesota offers teaching licenses only in secular subjects
 
 
 [6]
 Freshmen take a course in "Christian Identity"; sophomores take a semester class titled, "Christian Morality"; juniors and seniors must each take a full year of religion in classes such as "Person of Jesus," "World Religions," "Relationships in Marriage," and "Covenant Promise." According to its literature, Cathedral also offers a wide range of religiously-oriented extracurricular activities, including "celebrations of the Eucharist, small group liturgies, penance services, private confessions, [and] retreat opportunities."
 
 
 [7]
 Cathedral's literature consists of brochures sent to prospective students and their parents, and to foundations for contributions. The appellants strenuously contend that the Cathedral brochures cannot be used as evidence of the religious nature of the parochial school because they do not constitute a formal statement of the Cathedral policy, such as did the "Handbook of School Regulations" used to illustrate the pervasive religious atmosphere of the parochial schools in Lemon v. Kurtzman, 403 U.S. 602, 618-19, 91 S.Ct. 2105, 2113-14, 29 L.Ed.2d 745 (1971). The appellants instead characterize the brochures as mere "public relations tools" designed to "sell" Cathedral
 This argument is singularly unpersuasive. We have no reason to assume that the parochial school purposefully over-emphasized its religious nature to secure greater student attendance and larger foundation contributions. Further, the principal of Cathedral testified in deposition that he was "comfortable" with the brochures' representations, with the small exception that one slightly underestimated the number of Cathedral graduates to subsequently attend college. Cathedral's own statements on its religious nature seem more reliable than the appellants' characterization of the brochures.
 
 
 [8]
 The recruitment potential of student teaching placements is apparent from the deposition testimony of Ken Kelsey, former chairperson of the Department of Teacher Development, who stated, "At one time, many students wanted to go to the suburb because there were lots of jobs there."
 
 
 [9]
 Within this joint enterprise, the children will likely see the cooperating parochial school teacher as dominant. The student teacher, after all, remains subject to the supervision and dictates the cooperating teacher. The children, therefore, could perceive the state, through its student teacher representative, as not merely approving of religion, but also as actively seeking its approval
 
 
 [10]
 We do not consider here whether the danger that the student will inculcate religion itself rises to impermissible state aid to religion. We consider the danger only insofar as it furthers the perceptions that the state endorses the religious message of the schools
 
 
 [11]
 The district court also concluded that the University's policy impermissibly advanced religion by making it likely that the University students would inculcate religious beliefs, and because it did not limit the parochial schools' use of state funds. The court further held that the University policy tended to excessively entangle the state with religion