STATE of North Dakota,
Plaintiff/Appellee,

v.

Duane UNTERSEHER,
Defendant/Appellant.

Cr. No. 582.

Supreme Court of North Dakota.

May 26, 1977.

As Amended July 12, 1977.

Richardson & Blaisdell, Hazen, for defendant and appellant; argued by Josiah C. Blaisdell, Hazen.

John M. Olson, State's Atty., and Rolf P. Sletten, Asst. States Atty., Bismarck, for plaintiff and appellee; argued by Mr. Sletten.

PAULSON, Judge.

Duane Unterseher was adjudged by a jury to be the father of the minor child born to Sharon K. Olson on December 24, 1974. Unterseher appeals from the judgment of the district court of Burleigh County dated September 28, 1976, finding Unterseher to be the father of, and ordering Unterseher to make support payments for, said minor child in the sum of $150.00 per month until the child shall have reached the age of majority.

Five issues are raised on this · appeal:

(1) Do the former provisions of Chapter 32–36, N.D.C.C., violate the provisions of the United States Constitution and the North Dakota Constitution because such provisions deny due process and equal protection of the laws to a putative father;

(2) Did the trial court err in admitting into evidence the results of blood tests conducted on Unterseher, Sharon Olson, and Sharon Olson's infant child;

(3) Did the trial court err in allowing a challenged jury instruction to be given to the jury concerning the probative value to be given blood test results;

(4) Did the the trial court err by refusing to give a requested jury instruction concerning the jurors' assessment of the failure of the State to produce certain witnesses; and

(5) Are the support payments ordered by the trial court in the instant case excessive?

This is a paternity action, initiated by the State by summons and complaint dated June 5, 1974, in the Burleigh County Court of Increased Jurisdiction. At such time Sharon Olson's child was as yet unborn. Following a preliminary hearing, Unterseher was bound over to the Burleigh County District Court. The trial of the action in district court was deferred until after the birth of the child. At the time this action was commenced, the former provisions of Chapter 32–36, N.D.C.C., were controlling. Chapter 32–36, N.D.C.C., has since been repealed by our Legislature, effective July 1, 1975, and is superseded by the provisions of Chapter 14–17, N.D.C.C.

On December 24, 1974, Sharon Olson gave birth to a son. On January 31, 1975, a stipulation for blood tests was entered into between counsel for the respective parties. Such stipulation was drafted by counsel for Unterseher.

On September. 19, 1975, Unterseher made a motion for summary judgment alleging the unconstitutionality of North Dakota's illegitimacy law, Chapter 32–36, N.D.C.C. Such motion was denied by the trial court on December 23, 1975.

On March 9, 1976, Unterseher made a motion for the pretrial exclusion of blood test results. Such motion was denied on March 25, 1976, by the district court.

The trial of the case commenced on March 25, 1976. The results of the blood tests, which did not exclude Unterseher as the father, were admitted into evidence. A challenged jury instruction with reference to the jury's use of the blood test results was given, and a requested instruction con-

cerning the failure of the State to produce certain witnesses was not given. The jury returned a verdict finding Unterseher to be the father of Sharon Olson's infant child.

Subsequent to the jury's verdict, affidavits were submitted on behalf of Unterseher and Sharon Olson regarding their respective financial conditions. Based on such information, the district court ordered and adjudged that Unterseher should make support payments in the amount of $150.00 per month, commencing April 1, 1976, and continuing until the child attains the age of majority.

### I.

Unterseher contends that the application of the former provisions of Chapter 32–36, N.D.C.C., in paternity actions, is unconstitutional in that: (a) it violates Article V of the United States Constitution in that due process of law is not afforded a putative father, who may be deprived of life, liberty, and property without such due process; (b) it violates Article XIV of the Federal Constitution as it further denies to a person within the jurisdiction of the State of North Dakota equal protection of the laws of the State of North Dakota; (c) it contravenes § 11 of the North Dakota State Constitution in that it provides a law of a general nature which does not have uniform operation; (d) it contravenes § 13 of the North Dakota State Constitution in that it deprives the putative father of life, liberty, or property without due process of law; and (e) it violates § 20 of the North Dakota State Constitution in that it provides a special privilege to a class of citizens which upon the same terms is not granted to all citizens.

Unterseher bases his constitutional arguments upon the unequal rights and privileges afforded mothers of illegitimate children not shared by fathers, including: (1) a cause of action to determine the paternity of a child; (2) a cause of action to enforce the support obligations of the father of a child born out of wedlock; and (3) criminal sanctions to enforce the support obligations of a putative father. Unterseher asserts that reasonable grounds do not exist for such distinction or classification between two persons of the same class, i. e., parents.

The general rule is that a person to whom a statute may constitutionally be applied cannot challenge that statute on the grounds that it may conceivably be applied unconstitutionally to others. *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1959); *State v. Woodworth*, 234 N.W.2d 243 (N.D.1975); *State v. Gamble Skogmo, Inc.* 144 N.W.2d 749 (N.D. 1966).

A litigant may assert only his own constitutional rights, unless he can present "weighty countervailing policies". *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *State v. Woodworth, supra*. Unterseher has not asserted countervailing policies which would allow him to challenge the constitutionality of Chapter 32–36, N.D.C.C., on grounds that it may conceivably be applied unconstitutionally to others. We, therefore, restrict our review to the constitutionality of Chapter 32–36, N.D.C.C., as applied to the instant case.

Unterseher's argument fails in each instance. Except where the classification is inherently suspect, the Fourteenth Amendment to the United States Constitution permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than they affect others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. Only invidious discrimination is prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *McGowan v. State of Maryland*, 366 U.S. 420, 425–428, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960); *State v. Gamble Skogmo, Inc., supra*.

In the instant case, Unterseher has not personally attempted to affirmatively

establish his paternity, but, rather, he has actually attempted to deny paternity. Thus, Unterseher has no standing to challenge the constitutionality of Chapter 32–36, N.D.C.C., on the ground that it denies to a father an equal cause of action to establish his own paternity as that given to a mother, because Unterseher has not suffered any such discrimination.

 Unterseher's contention that the father and mother of an illegitimate child are persons of the same class and that no logical reason exists for the unequal treatment afforded to them by Chapter 32–36, N.D.C.C., is without merit. First, we note that there is in fact a recognizable factual basis for providing to a mother of an illegitimate child a cause of action to establish such child's paternity, and not providing to a father of an illegitimate child a cause of action to establish such child's maternity—the laws of nature are much more difficult to avoid than are the laws of man. In addition to the fact that a mother's maternity need not be established by court action, we also note that a mother of an illegitimate child is held to the same legal duty for the support of such child as is a putative father. The former provisions of § 32–36–01, N.D.C.C., provided:

"*Obligation of parents of child born out of wedlock.*—The *parents* of a child born out of wedlock and not legitimated owe the child necessary maintenance, education, and support. The parents are liable for the child's funeral expenses. The father also is liable for the expenses of the mother's pregnancy and confinement. *The obligation of the parents to support the child under the laws for the support of poor relatives applies to children born out of wedlock.*" [Emphasis added.]

The former provisions of § 32–36–21, N.D.C.C., specifically direct that the trial court order judgment for the support of an illegitimate child "having regard to the obligation of the father under section 32–36–01". § 32–36–21, N.D.C.C. Thus, under the former provisions of Chapter 32–36, N.D.C.C., both the mother and the father of an illegitimate child shared equally in the support

obligation for such a child. Further, as in the instant case, where a mother retains the custody of an illegitimate child, the former provisions of § 32–36–02, N.D.C.C., would apply in the enforcement of the mother's obligation of support:

"*Failure to support—Laws governing.* —The failure of a parent to support a child born out of wedlock where the same is in the custody of such parent shall be governed by the laws applicable to the failure to support a legitimate child."

Finally, § 14–07–15, N.D.C.C., provides in pertinent part:

"*Abandonment or nonsupport of child.* —Every parent or other person legally responsible for the care or support of a child who is unable to support himself by lawful employment, who wholly abandons such child or willfully fails to furnish food, shelter, clothing, and medical attention reasonably necessary and sufficient to keep the child's life from danger and discomfort and his health from injury is guilty of a class C felony.

. . . . .

Thus, in the case at bar, Sharon Olson is under the same duty to support her infant child as Unterseher is.

 Finally, Unterseher's contention that Chapter 32–36, N.D.C.C., is unconstitutional because the criminal sanctions to enforce the support obligation of a putative father are different than those used to enforce the support obligation of a mother of an illegitimate child is without merit. If Sharon Olson were to willfully fail to support her infant child, her support obligation could also be enforced through the use of criminal sanctions. §§ 32–36–02, 14–07–15, 14–07–17 through 14–07–22, N.D.C.C. The differences in treatment between a mother, under Chapter 14–07, N.D.C.C., and a putative father, under the former provisions of Chapter 32–36, N.D.C.C., lie in the fact that under Chapter 32–36, a putative father's support obligation has already been judicially determined, whereas under Chapter 14–07 such determination is yet to be made. Thus, a putative father's support obligation pursuant to the former provisions of Chap-

ter 32–36, N.D.C.C., is enforceable as a judgment of the district court, whereas the support obligation of a mother of an illegitimate child is still judicially unestablished at the time a complaint is brought by the State pursuant to § 14–07–15, N.D.C.C. Once such obligation is judicially established, taking into account the value of personal services as well as financial contribution, the support obligation of a mother is enforceable through the use of bonds in such amount and with such sureties as the court shall prescribe and approve in the same manner as is the support obligation enforceable as to a putative father pursuant to § 32–36–23, N.D.C.C. §§ 14–07–19 and 14–07–20, N.D.C.C.

Although Unterseher alleged due process violations under both the Federal and State constitutional due process provisions, he has not specifically alleged nor do we find after a perusal of the record any instances of due process violations in the application of the former provisions of Chapter 32–36, N.D.C.C.

## II.

Unterseher contends that the trial court erred in admitting into evidence the results of blood tests performed on Sharon Olson, her infant child, and Unterseher; together with an expert medical opinion that stated, in pertinent part:

"Interpretation: In the blood groups we have examined (see above), Duane Unterseher cannot be excluded from the paternity of Baby Boy Olson."

Prior to the trial of the instant case, the parties entered into a stipulation for blood tests which provided in pertinent part:

"STIPULATED that said report may be admitted in Court as evidence of such groupings, along with the opinion of Dr. Wasdahl as to whether the grouping excludes the paternity of Duane Unterseher of the infant son above described."

It is Unterseher's contention that such stipulation provides for the admission of blood test results only if they excluded Unterseher from the paternity of Sharon Olson's infant child, and that even if the stipulation

is so construed as to allow admission of blood test results not excluding paternity, the law of North Dakota then in effect did not permit nonexclusionary blood-groupings to be introduced into evidence, even on stipulation by the parties. We disagree.

Subject to a trial court's discretion to accept or reject proffered evidence on stipulation among the parties to an action, such parties may stipulate as to the necessary foundation for the admission of evidence to be introduced during a trial. *In re Sales & Use Tax Det. by St. Tax Com'r*, 225 N.W.2d 571 (N.D.1974); *Langer v. State*, 75 N.D. 435, 28 N.W.2d 523 (1947). In the instant case, we find the trial court's interpretation of the stipulation for blood tests to be correct. We find no basis, on the face of the stipulation, for Unterseher's argument that such blood test results were only to be admitted if they showed Unterseher not to be the father. Counsel for Unterseher drafted the stipulation and was at liberty to expressly state therein that such blood test results were to be admissible only if they excluded Unterseher—this he failed to do.

Although the former provisions of Chapter 32–36, N.D.C.C., contained no procedure either permitting or prohibiting the taking and admitting of blood test results, the provisions of §§ 14–17–10 and 14–17–11, N.D.C.C., are controlling and do provide for the taking and admitting into evidence of blood test results. This court has long adhered to the position that when a statute changing a rule of evidence has gone into effect, cases thereafter tried must be governed thereby, unless there is a limitation in the statute, even in cases where the pleadings were filed before the law became effective. *Conrad v. Smith*, 6 N.D. 337, 70 N.W. 815 (1897); *First Methodist Episcopal Church v. Fadden*, 8 N.D. 162, 77 N.W. 615 (1898). See, generally, 73 Am.Jur.2d Statutes § 355, p. 490; 82 C.J.S. Statutes § 424, p. 1001.

The report of nonexclusionary blood-groupings is of probative value for the determination of the ultimate issue in a

paternity action—whether the defendant is the father of the illegitimate child—in that it rebuts the negative proposition that Unterseher cannot be the father of Sharon Olson's infant child. In *State v. Hendrickson*, 240 N.W.2d 846 (N.D.1976), this court stated in paragraph 2 of the syllabus:

> "2. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence." [1]

The report of nonexclusionary blood-groupings is just as relevant as is the color of a child's hair or the color of a child's eyes, evidence that has been traditionally received to aid in the establishment of paternity. Nothing prevented Unterseher from introducing into evidence, pursuant to § 14–17–11(3), N.D.C.C., expert testimony that would have informed the jury of the statistical probability of Unterseher's paternity based on the blood tests given, and, thereby, affording the jury the tools by which it could give the nonexclusionary blood-groupings their proper weight.

### III.

Having concluded that the admission of the blood test results was proper, we must next consider Unterseher's assertion that the trial court improperly instructed the jury concerning the probative value to be given the blood test results.

The trial court instructed the jury on the probative value to be given the blood test results, as follows:

> "Members of the jury, you are instructed that in this case evidence of a blood grouping test from an expert witness has been received into evidence. You are instructed that the findings in the blood grouping test are not, in themselves, conclusive evidence of paternity, and that such evidence should be considered in light of all of the other evidence which has been offered in the case which would tend to prove or disprove such paternity."

Unterseher contends that the trial court's instruction afforded the blood test results too much weight in the minds of the jury. We disagree.

The instruction was given by the trial court as a result of a request by Unterseher's counsel for a precautionary instruction concerning the jury's evaluation of the blood test results. Unterseher desired an instruction that would give the blood test results minimal or no weight, but he proposed no substitute instruction to the trial court, and, on oral argument before this court, stated that it would be impossible for him to propose an adequate precautionary instruction.

█ Jury instructions must be considered as a whole, and if, when so considered, they correctly advise the jury as to the law, they are sufficient although parts of them standing alone may be erroneous or insufficient. *State v. Hendrickson*, 240 N.W.2d 846, 852 (N.D.1976), and cases cited therein.

█ We note that the trial court's instruction on blood tests that the

> ". . . findings in the blood grouping test are not, in themselves, conclusive evidence of paternity, and that such evidence should be considered in light of all of the other evidence which has been offered in the case which would tend to prove or disprove such paternity."

merely affirms the fact that nonexclusionary blood-groupings are inconclusive evidence of paternity, only rebutting a negative proposition—that Unterseher cannot be the father of Sharon Olson's infant child. As stated earlier herein, counsel for Unterseher was at liberty to introduce evidence to show the jury to what degree the nonexclusionary blood-groupings were inconclusive in the instant case. We do not believe that the instruction on blood tests as given, in the absence of a proposed substitute instruction, so confused the jury's perception of the law that a new trial should result.

---

1. This definition of "relevance" has been adopted in our new Rules of Evidence, Rule 401, N.D.R.Ev. Rule 402, N.D.R.Ev., states that, unless otherwise provided, all relevant evidence is admissible.

## IV.

Next, we consider Unterseher's contention that the trial court erred by refusing to give a requested jury instruction concerning the jurors' assessment of the failure of the State to produce certain witnesses. Unterseher's proposed Instruction No. 6 stated:

"If a party has failed to produce a witness available to him by the exercise of reasonable diligence, the witness not being equally available to the adverse party, in a circumstance where a reasonably prudent person under the same or similar situation would have produced such witness, if he had reason to believe the testimony to be favorable to him, and no reasonable explanation for such failure is given, you may infer that the testimony of the witness would be unfavorable to that party." NDJI 1006.

Unterseher contends that the requested Instruction No. 6 was intended to guide the jurors in their assessment of the failure of the State to produce any one of the three doctors who attended Sharon Olson during her pregnancy, particularly the State's failure to call Dr. Joseph W. Cleary, who performed the surgical procedures to deliver Sharon Olson's infant child by caesarean section. Unterseher contends that because testimony by the physicians who attended Sharon Olson would be subject to Sharon Olson's physician-patient privilege, statutorily set out in § 31–01–06, N.D.C.C., such witnesses were not equally available to him. Additionally, Unterseher contends that such testimony was not equally available to him because of monetary considerations, because he would have had to have tendered expert witness fees upon issuing a subpoena or subpoenas for the physician or physicians' testimony, not knowing, but fully anticipating, that Sharon Olson's physician-patient privilege would be asserted at trial. Such contention is not persuasive.

■■■ In *State v. Smith*, 238 N.W.2d 662, 667 (N.D.1976), this court stated:

"An adverse inference does not arise, however, where the witness is equally available to either party . . . when the testimony would be merely cumulative . . . or where the witness can be expected to exert a valid privilege which would exclude the anticipated testimony from the record . . . .''

Because Unterseher is not permitted to raise an inference of unfavorable testimony if Sharon Olson were to assert her physician-patient privilege and if such physician-patient privilege were valid, Unterseher's requested jury Instruction No. 6 was properly refused by the trial court. We need not address the question of whether or not the physician-patient privilege is waived by a complainant by the bringing of a paternity action [see *Sagmiller v. Carlsen*, 219 N.W.2d 885, 893–897 (N.D.1974)], because, in the instant case, the physicians were never called as witnesses and the privilege was never asserted and challenged.[2]

## V.

We now consider Unterseher's final argument, that the support payments ordered by the trial court in the instant case are excessive.

Following the return of the jury's verdict adjudging Unterseher to be the father of Sharon Olson's infant child, the question of support was submitted to the court on affidavits upon which the trial court ordered and adjudged Unterseher to pay $150.00 per month for the support of Sharon Olson's infant child, commencing April 1, 1976, and continuing thereafter until said child shall have reached the age of majority (age eighteen; see § 14–15–01(3), N.D.C.C.), or until the further order of the trial court.

Unterseher contends that the judgment ordered by the trial court is erroneous on two grounds: (1) that the former provisions of Chapter 32–36, N.D.C.C., limit both the amount and duration of support payments which may be ordered by the trial court upon a finding of paternity, and that the trial court's judgment that the support payments continue until Sharon Olson's infant child attains the age of eighteen is in direct

2. See Rules 503 and 512, N.D.R.Ev.

violation of § 32–36–21, N.D.C.C., which states that support payments shall be made only until the child reaches age sixteen; and (2) that the judgment amount, $150.00 per month, is excessive and unsupported by any showing of necessity for the support in such amount of Sharon Olson's infant child.

 We agree with Unterseher's first contention. The enlargement of the term of the support obligation from sixteen to eighteen years is a substantive change in our Code, and, as such, is to be applied prospectively unless the Legislature expressly declares that such provision should be given a retroactive application. § 1–02–10, N.D.C.C.; *Scranton Grain Co. v. Lubbock Machine & Supply Co.*, 186 N.W.2d 449, 453 (N.D.1971), and cases cited therein. Absent express declaration by our Legislature that § 14–17–14, N.D.C.C., is to be given retroactive application, it is subject to § 1–02–10, N.D.C.C., and therefore does not have retroactive effect.

 Unterseher's second contention is without merit. The trial court's determination of the amount to be paid by a parent for the support of an illegitimate child during the period for which a duty of support is owed is discretionary, based upon the trial court's consideration of all the relevant facts, including, but not limited to, those factors set out in § 14–17–14(5), N.D.C.C., as follows:

"5. . . .

"a. The needs of the child;

"b. The standard of living and circumstances of the parents;

"c. The relative financial means of the parents;

"d. The earning ability of the parents;

"e. The need and capacity of the child for education, including higher education;

"f. The age of the child;

"g. The financial resources and the earning ability of the child;

"h. The responsibility of the parents for the support of others; and

"i. The value of services contributed by the custodial parent."

After having made careful examination of the affidavits submitted to the trial court concerning the financial conditions of the respective parties, and after taking judicial notice of the cost, at the time the judgment was rendered, of raising a child, we find that the trial court did not abuse its discretion in ordering that support payments be made in the amount of $150.00 per month.

For the reasons stated herein, the judgment of the district court is modified to reduce the term during which child support payments shall be made from "until the child shall have reached the age of majority" to be "until the child shall have reached the age of sixteen". As so modified, the judgment is affirmed.

ERICKSTAD, C. J., and PEDERSON, VOGEL and SAND, JJ.