**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Deborah ANDERSON, Defendant and Appellant.**

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Lawrence E. ANDERSON, Defendant and Appellant.**

Cr. Nos. 870261, 870262.

Supreme Court of North Dakota.

June 28, 1988.

Wendy P. Schulz (argued), States Atty., Jamestown, for plaintiff and appellee.

Briggs Law Firm, Fargo, and Michael P. Farris (argued), Home School Legal Defense Ass'n, Great Falls, Va., for defendants and appellants.

ERICKSTAD, Chief Justice.

Lawrence and Deborah Anderson appeal from county court judgments of conviction for their violation of the compulsory school attendance law, Chapter 15–34.1, N.D.C.C. We affirm.

The parties stipulated that the Andersons continuously lived in the Jamestown School District during the 1986–87 school year and did not send their three school-age children to Jamestown Public Schools during that year. Lawrence testified that he and Deborah believe that God has given them responsibility for their children, including their education, and that their religious convictions require them to teach their children at home. Although they are not certified teachers the Andersons taught their children at their home school which was not an approved private or parochial school under Section 15–34.1–03(1), N.D.C.C. Lawrence and Deborah were each charged with three counts of violating the compulsory school attendance law, and after a bench trial, they were found guilty. They have appealed.

The Andersons first contend that the Legislature cannot regulate their home school because Article VIII, § 1, of the North Dakota Constitution authorizes the Legislature to create a system of public schools but does not authorize the Legislature to regulate education in non-public schools.

In construing constitutional provisions we apply principles of statutory construction. *Federal Land Bank of St. Paul v. Gefroh,* 418 N.W.2d 602 (N.D.1988). Our primary duty is to ascertain and give effect to the intent and purpose of the framers and adopters of the constitution. *Id.* Constitutional provisions as well as statutory provisions must be considered as

a whole to determine that intent. *See County of Stutsman v. State Historical Society of North Dakota*, 371 N.W.2d 321 (N.D.1985). Each section must be harmonized to give effect to each of its provisions whenever fairly possible. *Id.* In construing the North Dakota Constitution, we must also keep in mind that it is an instrument of limitations of authority whereas the United States Constitution is an instrument of grants of authority. *State ex rel. Agnew v. Schneider*, 253 N.W.2d 184 (N.D. 1977). The North Dakota Legislature thus has plenary powers except as limited by the state constitution, federal constitution, and congressional acts, *id.*, and treaties of the United States. Art. VI, § 2, U.S. Const.

▐ The relevant sections of Article VIII, N.D. Const., provide:

"*Section 1.* ... the legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control. ...

"*Section 2.* The legislative assembly shall provide for a uniform system of free public schools throughout the state, ...

"*Section 3.* In all schools instruction shall be given as far as practicable in those branches of knowledge that tend to impress upon the mind the vital importance of truthfulness, temperance, purity, public spirit, and respect for honest labor of every kind.

"*Section 4.* The legislative assembly shall take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity in course of study, and to promote industrial, scientific, and agricultural improvements."

Sections 1 and 2 authorize the Legislature to establish "public schools." However, those sections must be read and harmonized with Section 4 which authorizes the Legislature to take necessary steps to prevent illiteracy and ensure uniform instruction. Moreover, Section 3 requires that all schools instruct in areas of knowl-

edge that impress upon the mind the importance of "truthfulness, temperance, purity, public spirit, and respect for honest labor of every kind." When each of those constitutional provisions are given effect and harmonized, the Legislature's plenary power is not limited to regulating only "public schools." Rather, those constitutional provisions authorize the Legislature to regulate all schools subject, of course, to limitations that may be imposed by other constitutional provisions and congressional acts.

The Andersons nevertheless cite a Texas trial court decision, *Gary W. Leeper et al v. Arlington Independent School District et al*, No. 17–88761–85 (17th Jud.Dist.Tex. April 13, 1987), in support of their position. In that case Section 21.033(a)(1) of the Texas Education Code provided that any child in attendance at a "private or parochial school" was exempt from the requirements of compulsory attendance; however, the Texas Legislature had not defined "private or parochial school" and had not given the Texas Education Agency or the State Board of Education the authority to define those terms. The Texas court determined that the Texas State Board of Education had no authority to promulgate a rule defining "private or parochial school" in a manner inconsistent with Texas' historical practice of permitting home schools to qualify as private or parochial schools.

The Texas case was decided on the issue of the legislative delegation of authority to an administrative board and is therefore distinguishable from the issue presented in these cases. Moreover, although Texas had a constitutional provision similar to N.D. Const. Art. VIII, § 1, it did not have constitutional provisions similar to sections 3 and 4. Accordingly, we do not believe that the Texas decision provides persuasive authority for interpreting our constitutional provisions. We therefore conclude that Article VIII of the North Dakota Constitution authorizes the Legislature to regulate public and private schools.

▐ The Andersons next contend that Section 15–34.1–03, N.D.C.C., authorizes a financially interested decisionmaker, the local school board, to determine whether or

not a student may be excused from public school attendance. The Andersons assert that the Jamestown School District receives between $1,200 and $1,900 in foundation aid payments for each student attending public school and therefore the local school board has a financial interest in not excusing students from the compulsory attendance law under Section 15–34.1–03, N.D.C.C. Relying on *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), the Andersons argue that Section 15–34.1–03, N.D.C.C., therefore violates the due process clause of the Fourteenth Amendment of the United States Constitution.

The State responds that the Andersons' religious objections are based on having their children taught at schools utilizing certified teachers as required by Section 15–34.1–03(1), N.D.C.C., and that, pursuant to that section, the local school board does not approve private or parochial schools and has no decision-making power, but merely monitors whether or not school-age children are attending approved schools.[1]

Section 15–34.1–03, N.D.C.C., provides, in relevant part:

"The parent, guardian, or other person having control of a child required to attend school by the provisions of this chapter shall be excused by the school board from causing the child to attend school whenever it shall be shown to the satisfaction of the board, subject to appeal as provided by law, that one of the following reasons exists:

"1. That the child is in attendance for the same length of time at a parochial or private school approved by the county superintendent of schools and the superintendent of public instruction. No such school shall be approved un-

---

**1.** The State also notes that the Andersons failed to apply for an excuse from the compulsory attendance law under Section 15–34.1–03, N.D.C.C. The Andersons respond that they are raising a facial attack on the constitutionality of Section 15–34.1–03, N.D.C.C., and therefore they were not required to apply for an excuse in order to raise its constitutionality. Because of our interpretation of Section 15–34.1–03(1), N.D.C.C., we do not decide whether or not the Andersons were required to apply for an excuse in order to raise the constitutionality of Section 15–34.1–03(1), N.D.C.C.

Moreover, a litigant to whom a statute may constitutionally be applied generally cannot challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court. *E.g., Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *State v. Unterseher*, 255 N.W.2d 882 (N.D.1977). That rule was developed to free courts from "unnecessary pronouncement on constitutional issues," and to prevent "premature interpretations of statutes in areas where their constitutional application might be cloudy." *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524, 530 (1960). Thus a litigant may contest the constitutionality of a statute only as it is applied to his or her conduct unless there are "weighty countervailing policies" to justify third-party standing. *United States v. Raines, supra*, 362 U.S. at 22, 80 S.Ct. at 523, 4 L.Ed.2d at 530; *State v. Unterseher, supra*, 255 N.W.2d at 886; *State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749, 769 (N.D.1966). *See* Annot. 50 L.Ed.2d 902 (1978); Note, Standing to Assert Constitutional Jus Tertii, 88 Harv. L.Rev. 423 (1974).

One area in which significant countervailing policies have been found is within the context of First Amendment rights, and facial challenges based upon overbreadth and void-for-vagueness have been permitted in freedom of speech and association challenges under the First Amendment. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Broadrick v. Oklahoma, supra; Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

Although First Amendment freedom of religion issues are involved with other issues in these cases, this precise due process issue involves whether or not the local school board has an impermissible financial interest in not excusing students from the compulsory attendance law. The Andersons defended this criminal prosecution on the grounds that their religious beliefs would be violated by having their children educated at an approved parochial or private school as required by Section 15–34.1–03(1), N.D.C.C. More specifically the Andersons' religious objections are based on the requirement that in order for a private or parochial school to be approved under Section 15–34.1–03(1), N.D.C.C., it must utilize certified teachers. The Andersons have not asserted that their religious beliefs would be violated by the exceptions to the compulsory attendance law contained in subsections (2), (3), or (4) of Section 15–34.1–03, N.D.C.C., and their due process challenge does not involve "weighty countervailing policies" which would permit them to assert that those subsections of Section 15–34.1–03, N.D.C.C., violate due process.

less the teachers therein are legally certificated in the state of North Dakota in accordance with section 15–41–25 and chapter 15–36, the subjects offered are in accordance with sections 15–38–07, 15–41–06, and 15–41–24, and such school is in compliance with all municipal and state health, fire, and safety laws."

The Due Process Clause entitles a litigant to an impartial, neutral, and disinterested tribunal in both civil and criminal cases. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Neutrality in adjudicative proceedings safeguards two critical concerns of procedural due process: the prevention of unjustified or mistaken deprivations and the opportunity for the individual affected by the decisionmaking to participate in the process with the assurance that the arbiter is not predisposed to find against him. *Id.* Thus, in *Tumey v. Ohio, supra,* the United States Supreme Court reversed criminal convictions rendered by a city judge who was also the city mayor and whose salary as mayor was paid in part by fees and costs levied by him in his judicial capacity. The Court stated that the Due Process Clause would not permit any "procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." *Tumey v. Ohio, supra,* 273 U.S. at 532, 47 S.Ct. at 444. In *Ward v. Village of Monroeville, supra,* the Court invalidated a procedure by which sums produced from a mayor's court accounted for a substantial portion of municipal revenues, even though the mayor's salary was not augmented by those sums.

In assessing the Andersons' due process argument we must keep in mind that if a statute is susceptible of two constructions, one of which would render it of doubtful constitutionality and one which would not, the later construction must be adopted. *E.g. Jensen v. State,* 373 N.W.2d 894 (N.D. 1985).

In order to remove any doubt of due process infirmities under Section 15–34.1–03(1), N.D.C.C., we construe that provision to require the local school board to monitor whether or not a school-age child is attending a school that has been approved by the county superintendent of schools and superintendent of public instruction. The local school board's function is to monitor that attendance, and attendance at an approved private or parochial school automatically satisfies the compulsory attendance law. The local school board's act is a ministerial function rather than a discretionary, decision-making function and is distinguishable from the function of the mayor-city judge in *Tumey v. Ohio, supra,* and *Ward v. Village of Monroeville, supra.* We conclude that Section 15–34.1–03(1), N.D.C.C., does not violate the Due Process Clause of the United States Constitution.[2]

■ The Andersons next assert that the compulsory attendance law violates the Establishment Clause of the First Amendment of the United States Constitution by requiring religious schools to seek approval from the State.

The First Amendment prevents Congress from enacting laws respecting an establishment of religion or prohibiting the free exercise of religion and was made applicable to the states through the Fourteenth Amendment in *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

In *Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the United States Supreme Court outlined a three-prong test for as-

**2.** Because the local school board has no decision-making function under Section 15–34.1–03(1), N.D.C.C., we need not balance the interests of the parties to determine the specific dictates of due process. *See Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982); *Marshall v. Jerrico, Inc., supra; Hortonville Joint School District No. 1 v. Hortonville Education Assn.,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *Beckler v. North Dakota Workers Compensation Bureau,* 418 N.W.2d 770 (N.D.1988).

sessing whether or not a policy or statute violates the Establishment Clause:

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, ... finally, the statute must not foster 'an excessive government entanglement with religion.'" [Citation omitted.]

The Andersons contend that because the compulsory attendance law requires advance government approval for religious schools and requires religious schools to employ only teachers certified by the state, the compulsory attendance law violates the Establishment Clause, citing *Stark v. St. Cloud State University*, 802 F.2d 1046 (8th Cir.1986), and *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985).

In *Stark, supra,* St. Cloud State University, a Minnesota public university, permitted students seeking to become licensed teachers to fulfill student teaching requirements by instructing at a parochial high school participating in the University's student teaching program. In the student teaching course, the University placed the student teacher in a participating high school that had contracted to become a student teaching site, and the University paid the participating high school $96 per quarter for each student teacher with no limits on the participating school's use of the money. The student teacher worked under the full-time supervision of a licensed teacher employed by the participating high school, and once a week a supervisor from the University observed the student teacher's classroom performance. A student teacher could, at his or her option, be placed at a private or parochial school selected by the University to participate in the student teaching program, but final approval of the student teacher's placement rested with the University's field experience coordinator. The student teacher's participation in any religious aspect of the participating high school was exclusively between the school's personnel and the student teacher.

Under those circumstances the Eighth Circuit Court of Appeals concluded that the participating parochial schools were pervasively sectarian institutions and that the University's student teaching program could not help but communicate a message of government endorsement of the parochial schools and their religious messages. The court concluded that there was a union between church and state which had the primary effect of advancing religion in violation of the Establishment Clause.

In *Aguilar, supra,* New York City used federal funds to pay salaries of public school employees who taught in parochial schools in the city. The program authorized federal financial assistance to local educational institutions, including parochial schools, to meet the needs of educationally deprived children from low-income families. The programs were carried out by regular employees of the public schools who had volunteered to teach in the parochial schools. The instructors were supervised by field personnel who made at least one unannounced visit per month. The field supervisors reported to program supervisors who also made occasional unannounced visits to monitor classes in the parochial schools. The professionals involved in the program were instructed to avoid involvement with religious activities that were conducted within the private schools and to bar religious materials in their classrooms. All material and equipment used in the funded program was supplied by the State and was used only in those programs.

Under those circumstances the Supreme Court held that the federally funded program violated the Establishment Clause because the state supervision and administrative cooperation required to monitor the educational program required permanent and pervasive state presence in the sectarian schools receiving aid, thus entangling the church and state in a way that infringed interests at the heart of the Establishment Clause. *See also Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).

The primary effect of the state policy and the level of state entanglement with religion in *Stark, supra,* and *Aguilar, su-*

*pra,* is distinguishable from that involved here. In these cases the law requires state approval of private schools and certification of the school's teachers in order for students to be excused from the compulsory school attendance law. Requiring private or parochial schools to employ certified teachers and to obtain prior state approval is not synonymous with the use of state funds to employ teachers at parochial schools. Compare *Stark, supra; Aguilar, supra.*

As the United States Supreme Court said in *Lemon v. Kurtzman, supra,* 403 U.S. at 614, 91 S.Ct. at 2112, 29 L.Ed.2d at 756:

> "Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable.... Fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws are examples of necessary and permissible contacts." [Citations omitted.]

Teacher certification and advance government approval of private schools are constitutionally sound means of regulating the adequacy of education and do not indicate a primary effect of advancing or inhibiting religion. Neither do those requirements indicate an excessive government entanglement with religion. We conclude that teacher certification and advance government approval of non-public schools under Section 15–34.1–03(1), N.D.C.C., is a permissible contact between the state and non-public schools and does not violate the Establishment Clause.

■ The Andersons next contend that the compulsory school attendance law violates the Free Exercise Clause of the First Amendment of the United States Constitution.[3]

Free Exercise analysis in this context requires a determination of (1) whether or not the activity interfered with by the state is motivated by and rooted in a sincerely-held religious belief; (2) whether or not the parents' free exercise of religion has been burdened by the regulation, and, if so, the extent of or impact of the burden on their religious practice; and (3) whether or not the state has a compelling interest in the regulation which justifies the burden on the free exercise of religion and overrides the interest of the parents in exercising their religious practices. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *State v. Patzer,* 382 N.W.2d 631 (N.D.1986), *cert. denied* 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 50 (1986); *State v. Rivinius,* 328 N.W.2d 220 (N.D.1982), *cert. denied* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *State v. Shaver,* 294 N.W.2d 883 (N.D.1980). If the state has a compelling interest which justifies the burden on the free exercise of religion, the state must demonstrate that the regulation constitutes the least restrictive means of ensuring that its primary interest in the education of children is met. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *State v. Patzer, supra.*

The parties concede that the Andersons' religious beliefs are sincere and that teacher certification has an adverse affect on the practice of their religion. They also concede that the State has a compelling interest in the education of children. Thus the only disputed issue in the free exercise area is whether or not the State has chosen the least restrictive alternative to achieve its compelling interest.

The Andersons present several arguments to support their position that teacher certification is not the least restrictive alternative to satisfy the State's compelling interest in education.

The Andersons first argue that the experience from other states demonstrates that less restrictive alternatives to teacher certification are available. That argument was raised in *State v. Patzer, supra,* and although the Andersons have also argued that *Patzer, supra,* was wrongly decided, we decline to deviate from our decision in that case in which we concluded:

---

3. The Andersons have not made any due process, establishment, or free exercise arguments under parallel provisions of the North Dakota Constitution.

"While a teaching certificate is no guarantee that the holder is a competent teacher, it does guarantee that the holder has been exposed to the knowledge that a competent teacher should have. *See Benton, supra.* [382 N.W.2d 639 (D.C. Iowa 1985)]. We believe that the teacher certification requirement for instructors in public, non-public, or home schools is a reasonably narrow one and is amply justified. *See Jernigan v. State,* 412 So.2d 1242 (Ala.Crim.App.1982). Teacher certification appears to us to be among the least personally intrusive methods now available to satisfy the state's prime interest in seeing that its children are taught by capable persons." *State v. Patzer, supra,* 382 N.W.2d at 639.

The Andersons also argue that the State's own experts now concede that less restrictive alternatives will satisfy the State's compelling interest in education. The Andersons rely on a study done by a Task Force Committee convened in 1985 at the request of Dr. Wayne Sanstead, the North Dakota Superintendent of Public Instruction. They assert that the results of that study establish that less restrictive alternatives will satisfy the State's compelling interest in education. Thus, they argue that there has been a change in circumstances since this court decided *State v. Patzer, supra.*

The Assistant Superintendent of the Department of Public Instruction, Ronald Stastney, testified that the Task Force study was conducted to try to achieve a compromise and avoid the litigation that had arisen out of the teacher certification requirement. The Task Force made three proposals. The first proposal authorized home schools for children under the age of thirteen and required teachers in the home schools to have a baccalaureate degree from a college or university recognized by the Department of Public Instruction. That proposal authorized the local school district board of education to approve and withdraw approval of home schools and included the following provision for supervision of approved home schools:

"In the instances where local school districts approve home schools, the local school district shall provide a state certified, supervising teacher for the home school to assure that an adequate educational program is being conducted. (Duties of the supervising teacher and local school districts shall be established by the Department of Public Instruction regulations under authority of NDCC 28–32–01.)"

The second proposal changed the penalty for a violation of compulsory attendance law to a civil penalty of up to $50 for each day of noncompliance.

The third proposal gave the following supervisory responsibilities to the local school district:

"1. *Assignment of Supervising Teacher*

"Duties:

"a. Home school visitations of a minimum of five hours per month.

"b. Assure that school is operating in accordance with approved calendar.

"c. Assure instruction in those academic subjects is being offered as required by statute.

"d. Assure that proper recordkeeping is being maintained and copies provided to the local district (requirements shall be the same as the local district).

"e. Provide technical assistance in teaching methods; use of materials and curriculum requirements.

"f. Assessment of student progress which shall include standardized achievement tests as required by the district for regularly enrolled students, teacher observation, student work and/or program testing.

"g. Report to local district on a regular schedule findings regarding the student and other relevant factors regarding the status of the home instructional program.

"h. Other duties as may be required by the Department of Public Instruction."

The Task Force proposals, along with a proposal from the North Dakota Home School Association, were submitted to the

1987 Legislative Council Interim Education Committee. The Task Force proposals were opposed by representatives of the Home School Association:

"They expressed the views that the proposal would have placed several limitations upon the exercise of the freedoms of parents to educate their children at home; arbitrarily cut off the right to teach a child at home after the child reached the age of 13; unconstitutionally violated the principle of 'conflict of interest' because it would have allowed the local school board to approve or disapprove home education when there was a financial stake in the decision (public schools have a financial stake because they receive state aid and other money for each student that attends a public school); arbitrarily and capriciously required parents to have baccalaureate degrees; unconstitutionally delegated legislative authority to the Superintendent of Public Instruction to place additional burdens on home schools with its rulemaking power; unconstitutionally denied equal protection of the law to those who could not afford to pay the civil fine of $50 a day to keep their children at home

or in an alternative school; and violated the establishment clause by allowing teachers from public schools to supervise private religious schools." Report of the North Dakota Legislative Council to the Fiftieth Legislative Assembly, 1987, p. 72.

The Interim Committee made no recommendation to Legislature "due to the difficulties with and opposition to each proposal considered." Report of the North Dakota Legislative Council to the Fiftieth Legislative Assembly, 1987, p. 73.[4]

The substantive proposals from the Task Force and the Home School Association's opposition to those proposals amply demonstrates that the Task Force Study was conducted to avoid litigation that had arisen out of the teacher certification requirements and do not demonstrate a less restrictive alternative that would satisfy the State's compelling interest in education.

Moreover, on one hand, in the Establishment area, the Andersons have argued that compulsory attendance laws violate the Establishment Clause because it "prohibits the entry of the public teacher or official

**4.** Although the Task Force proposals were not introduced at the Fiftieth Legislative Assembly, H.B. 1523 was introduced but did not pass the Legislature. That bill permitted home school instruction provided the court having jurisdiction over the child gave its permission and the instruction was equivalent to that provided in public schools. H.B. 1523 defined equivalent instruction as:

"1. The parent or guardian providing instruction to the child holds a current North Dakota teacher's certificate, has a college baccalaureate degree, or has passed the basic skills section of a standardized written teacher proficiency examination as prescribed by the superintendent of public instruction.

"2. The child has made satisfactory academic progress as compared to the same standards of promotion or retention in effect for the public schools located within that district as tested by the Iowa test of basic skills (1986 edition), or the Stanford achievement test, or the California achievement test, or from either one of two additional tests the superintendent of public instruction may select in the areas of the English language, grammar, reading, spelling, social studies, science, and mathematics. In the case of blind, deaf, physically or mentally handicapped children, or children with commonly recognized learning disabilities, the parent, guardian, or other per-

son with custody of the child may substitute for a standardized test a written statement made by a licensed or certified professional trained in the education or evaluation of such children that the educational progress of the child is equivalent to that which would be achieved by a public school. A child attending a defined home school must be tested at the same grade and as frequently as a child in a public school, provided that each test must be given in the child's learning environment. The parent or guardian of the child must choose one of the following persons to monitor the test taking:

"a. A certificated teacher.

"b. A local school administrator.

"c. The county superintendent.

"3. The home school basic instructional program has been approved by either the school board of the school district where the child resides, or the county superintendent of schools of the county where the child resides, or the superintendent of public instruction. This subsection does not require the program to include any concept, topic, or practice in conflict with the parents' religious doctrines or to exclude from its curriculum any concept, topic, or practice consistent with the parents' religious doctrines."

into the religious school" and on the other hand, in the Free Exercise area, the Andersons argue that the Task Force proposals, including visits, monitoring, and supervision of the home schools by state personnel, would be less restrictive on their free exercise rights. The Andersons' arguments present a collision between the Free Exercise and Establishment Clauses and demonstrate that less restrictive alternatives do not necessarily satisfy the state's compelling interest in education and at the same time meet the dictates of the Establishment Clause. *See State v. Shaver, supra,* (VandeWalle, Justice, concurring specially).

We are not persuaded that the Task Force proposals necessarily provide less restrictive alternatives to teacher certification which satisfy the state's compelling interest in education and avoid the entanglement proscribed by the Establishment Clause. Accordingly, we adhere to our decision in *Patzer, supra,* that teacher certification does not violate the Free Exercise Clause.

The judgments of conviction are affirmed.

VANDE WALLE, LEVINE and GIERKE, JJ., concur.

MESCHKE, Justice, dissenting.

I largely concur in the analysis of the majority opinion concerning the State Constitution, the Due Process Clause and the Establishment Clause. However, I view the issue on the Free Exercise Clause as more difficult. On that issue, my analysis differs. Therefore, I respectfully dissent.

The Free Exercise Clause of the First Amendment to our United States Constitution declares that government "shall make no law ... prohibiting the free exercise [of religion]." While not absolute to the exclusion of all governmental interests, this freedom ranks among the foremost-respected values of our diverse American culture. "... [W]e have become a Nation of many religions and sects, representing all of the diversities of the human race." *Wisconsin v. Yoder,* 406 U.S. 205, 249, 92 S.Ct. 1526, 1550, 32 L.Ed.2d 15 (1972) (Justice Douglas, dissenting). When government seeks to use the compulsion of our criminal laws to override sincerely held religious beliefs, painstaking judicial review is essential if freedom of religion is to be truly meaningful—more than a high sounding phrase emptied of purpose by majoritarian winds, as in some nations.

It is well established that judicial review requires a sufficiently important governmental interest to justify a particular burden on the freedom of religion. When evaluating compulsory school attendance laws, the state must show "with sufficient 'particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption' " for the religious convictions claimed. *Lyng v. Northwest Indian Cemetery Protective Association,* —— U.S. ——, 108 S.Ct. 1319, 1329, 99 L.Ed.2d 534 (1988) (quoting from *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).

"Long before there was general acknowledgment of the need for universal formal education, the Religion Clauses had specifically and firmly fixed the right to free exercise of religious beliefs, and buttressing this fundamental right was an equally firm, even if less explicit, prohibition against the establishment of any religion by government. The values underlying these two provisions relating to religion have been zealously protected, sometimes even at the expense of other interests of admittedly high social importance.

" ...

"The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests." *Wisconsin v. Yoder, supra* at 214–215, 92 S.Ct. at 1532–33, 32 L.Ed.2d at 24.

The State made no effort to demonstrate that its interest in educating children would be disrupted by granting an exemption for these religious beliefs. The State simply relied upon our decision in *State v. Patzer*, 382 N.W.2d 631 (N.D.1986), as binding precedent that teacher certification was "the least personally intrusive method[ ]" of assuring education of all children. The majority opinion adopts the same attitude and simply concludes that *State v. Patzer* is still controlling.

I joined in Justice Levine's opinion for this court in *Patzer, supra.* That opinion recognized that we were performing "a sensitive and delicate task." 382 N.W.2d at 636. In "[b]alancing the defendant's religious beliefs and the nature of the burden imposed upon those beliefs by the teacher certification requirement," *id.* at 639, I voted to uphold the teacher certification requirement. But, additional arguments in this case and in other related cases also before us, together with further study of related and new United States Supreme Court decisions on the free exercise of religion, have brought me to view this case differently.

I am now convinced that, in *Patzer*, we read *Yoder* too narrowly and focused our analysis inappropriately. We should expect more from the State. The State must affirmatively show us that its compulsory education program would not work if it granted a religious exemption to these defendants. Our responsibility is to strictly scrutinize the need for the State's purpose to prevail over sincere religious convictions.

We have a recent teaching from the United States Supreme Court about how *Yoder* should be interpreted and applied:

"The statute at issue in that case [*Yoder*] prohibited the Amish parents, on pain of criminal prosecution, from providing their children with the kind of education required by the Amish religion. *Id.,* [406 U.S.], at 207–209, 223 [92 S.Ct. at 1529–1530, 1537]. The statute directly compelled the Amish to send their children to public high schools 'contrary to the Amish religion and way of life.' *Id.,* at 209 [92 S.Ct. at 1530]. The Court

acknowledged that the statute might be constitutional, *despite* its coercive nature, if the state could show with sufficient 'particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish.' *Id.,* at 236 [92 S.Ct. at 1543] (citation omitted). The dissent's out-of-context quotations notwithstanding, there is nothing whatsoever in the *Yoder* opinion to support the proposition that the 'impact' on the Amish religion would have been constitutionally problematic if the statute at issue had not been coercive in nature." *Lyng v. Northwest Indian Cemetery Protective Association*, 108 S.Ct. at 1329.

*Lyng* held that the Free Exercise Clause did not prohibit the United States Government from permitting timber harvesting or constructing roads on lands owned by the United States which were sacred to certain American Indians. Lack of coercion to participate in an internal government action was a key factor in *Lyng.* The dissent by Justice Brennan, and joined by Justices Marshall and Blackmun, makes that vividly clear. This case is coercion by criminal prosecution.

I think we were also mistaken when we read *Yoder* as only involving "exceptional considerations" of a community of like minded, religious people with "a long history of being a successful, self-sufficient segment of society." 382 N.W.2d at 637. It is well established that the Free Exercise Clause does more than protect established religions and discrete groups. Individual religious beliefs, as much as institutionalized ones, are protected by our Constitution. In *Thomas v. Review Board*, 450 U.S. 707, 715–716, 101 S.Ct. 1425, 1430–31, 67 L.Ed. 624 (1981), the United States Supreme Court said that the "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." Justice O'Connor's pointed remarks for the majority in *Lyng* emphasize this eloquently:

"... [T]he dissent ... offers us the prospect of this Court holding that some sincerely held religious beliefs and practices

are not 'central' to certain religions, despite protestations to the contrary from the religious objectors who brought the lawsuit. In other words, the dissent's approach would require us to rule that some religious adherents misunderstand their own religious beliefs. We think such an approach cannot be squared with the Constitution or with our precedents, and that it would cast the judiciary in a role that we were never intended to play." *Lyng*, 108 S.Ct. at 1329–30.

Thus, our analysis should be focused on the State's showing of how an exemption for religious belief would affect the state's educational program, more than on how the intrusion would affect sincere individual beliefs. "... [I]t would require a more particularized showing from the State on this point to justify the severe interference with religious freedom such additional compulsory attendance would entail." *Wisconsin v. Yoder, supra* 406 U.S. at 227, 92 S.Ct. at 1539, 32 L.Ed.2d at 32. The choice between religious belief and state interest comes only after the State shows that toleration of the religious belief will seriously undermine the state program of education. Here, the record is bare.

Andersons have advanced the position that North Dakota is nearly alone in enforcing teacher certification for all its teachers, without allowing home schooling. This has not been seriously contested by the State. No argument has been made or evidence offered by the State that the educational efforts of 47 other states, which apparently tolerate some form of home schooling, are failing. In this sensitive constitutional area, the burden of persuasion should be on the influential State, not well-intentioned parents. In this case, the State sought to weigh in only with the bare precedent of *Patzer*, and no other effort. To me, that is not enough.

"... [T]his case involves the fundamental interest of parents as contrasted with that of the State, to guide the religious future and education of their children. The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder, supra* at 232, 92 S.Ct. at 1541, 32 L.Ed.2d at 35.

We are told by these defendants that only three states, including North Dakota, require teacher certification for all teachers, while all other states permit home schooling in some form. The State's sole response was, "What other states may be doing ... does not, and cannot alter the legal precedence which is well settled on this issue in this Circuit," citing only *Patzer, supra*. This response cannot be sufficient. If the experience of many other states shows that a religious exemption for home schooling does not seriously impair education of children, this State must certainly explain why conditions are different here. Full respect for free exercise of religion, as a cherished freedom, may well force repeated efforts by the government to show that particular purposes cannot be adequately accomplished without overriding deeply held beliefs by compulsion. The State's position is unacceptable because it offers neither explanation or evidence about how or why its educational system would be significantly impaired or rendered ineffectual by recognizing a religious exemption. We should not synthesize those effects for the State when they are not properly submitted, as we did in *Patzer. See* 382 N.W.2d at 637, footnote 4.

"This would be a very different case for me if respondents' claim were that their religion forbade their children from attending any school at any time and from complying in any way with the educational standards set by the State." *Wisconsin v. Yoder, supra* at 238, 92 S.Ct. at 1544, 32 L.Ed.2d at 38 (Justice White, concurring).

This State does recognize exemptions from compulsory education. An administrative procedure is already in place for processing exemption claims based upon good reasons. There is not only the approved "parochial or private school" exemption in subsection 1 of NDCC 15–34.1–

03, quoted in the majority opinion. There are three more:

"2. That the child has acquired the branches of learning taught in the public schools and has completed high school.

"3. That the child actually is *necessary to the support of his family,* which shall be a question of fact to be determined by the governing board of the district with the approval of the county superintendent of schools, and such determination shall be subject to review by the superintendent of public instruction on appeal.

"4. That the child is in such physical or mental condition as to render attendance or participation in the regular or special education program inexpedient or impracticable. Such condition shall be shown by a declaration of a multidisciplinary team which includes the director of special education of the special education unit of which the school district of residence is a member, the school superintendent of the child's district of residence, the child's classroom teacher, the child's physician, and the child's parent or guardian." (emphasis added).

I refer to these legislated excuses to illustrate that exemptions can and do exist while carrying out a general program of educating children. Again, the State has made no effort to justify the existence of an economic exemption "necessary to the support of [a child's] family" at the same time that it denies one for religious beliefs. Surely, First Amendment values are equal to other values which may be adversely affected by a state program.

I believe that the North Dakota compulsory school-attendance law does interfere with the freedom of these defendants to act in accordance with their sincere religious beliefs. I believe that the State has failed to show that its interest in establishing and maintaining an educational system overrides these defendants' rights to free exercise of their religion. Therefore, I respectfully dissent.